*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0392p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MOROSS LIMITED PARTNERSHIP,

*Plaintiff-Appellant/*
*Cross-Appellee,*

v.

FLECKENSTEIN CAPITAL, INC., WILLIAM
FLECKENSTEIN, and RTM FUND, L.P.,

*Defendants-Appellees/*
*Cross-Appellants.*

Nos. 05-2280/2312

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-74307—Avern Cohn, District Judge.

Argued: September 20, 2006

Decided and Filed: October 24, 2006

Before: CLAY and GILMAN, Circuit Judges; STAFFORD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Bradford T. Yaker, BRADFORD T. YAKER, P.C., Bingham Farms, Michigan, for
Appellant. M. William Munno, SEWARD & KISSEL LLP, New York, New York, for Appellees.
**ON BRIEF:** Bradford T. Yaker, BRADFORD T. YAKER, P.C., Bingham Farms, Michigan, for
Appellant. M. William Munno, SEWARD & KISSEL LLP, New York, New York, John H. Dudley,
Jr., BUTZEL LONG, Detroit, Michigan, for Appellees.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. This case arises from the investment of $750,000
by Moross Limited Partnership into the RTM Fund, L.P, a private investment fund. After the RTM
Fund lost 90% of its assets due to an unsuccessful strategy of "short-selling" in the securities market,
Moross sued the RTM Fund, its general partner, and its investment manager (collectively, the
defendants). Moross's suit alleged violations of Michigan's Uniform Securities Act (MUSA), fraud,

---

[*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting
by designation.

and breach of fiduciary duty. Both sides moved for summary judgment after a lengthy period of discovery. In addition, the defendants moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. The district court granted summary judgment in favor of the defendants, but denied their motion for sanctions.

On appeal, both parties renew their arguments made below. The defendants further move for sanctions under Rule 38 of the Federal Rules of Appellate Procedure because they claim that Moross has pursued a frivolous appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court, but **DENY** the defendants' motion for sanctions on appeal.

## I. BACKGROUND

### A. Factual background

In December of 1996, William Fleckenstein, the sole shareholder of Fleckenstein Capital, Inc., sent a letter to Stanley Dickson, a Michigan attorney, accountant, and investor, soliciting him to invest in the RTM Fund. The RTM Fund, a Delaware limited partnership that invests in publicly traded securities, was managed by Fleckenstein Capital as its General Partner. Fleckenstein Capital is based in the state of Washington. Included with the solicitation letter was a "Confidential Private Offering Memorandum" (Offering Memo), which explained that, because "[t]his is a private offering[,] . . . [t]he limited partnership interests offered hereby have not been registered with or approved by the Securities and Exchange Commission or any state securities agency."

In April of 1997, Dickson established the Moross Limited Partnership as the vehicle for his investment in the RTM Fund. As Moross's sole general partner, Dickson invested $750,000 with Moross, which was later transferred into the RTM Fund.

The primary investment strategy of the RTM Fund was to "sell short," which meant that the fund would borrow and then immediately sell shares of a stock that it did not own with the intent to buy the shares back at a later time in order to close out the transaction. If the price of the stock dropped between the sale and the later purchase, then the RTM Fund would profit by selling high and buying back low. Only "accredited investors"—defined by Rule 501 of the Securities and Exchange Commission (SEC) as an individual with a net worth of at least $1,000,000 or an entity with assets of at least $5,000,000—could invest in the RTM Fund because of its private status and its exemptions from the SEC's public-offering regulations. In addition to Dickson and other investors, William Fleckenstein, along with his mother and his sister, personally invested over $1.1 million in the RTM Fund. Fleckenstein also personally invested in a separately managed account (the Fleckenstein Account) as he was permitted to do under the Offering Memo.

The RTM Fund's short-selling strategy proved very unprofitable during the bull market of 1998-2000. In April of 2000, Dickson requested spreadsheets detailing the daily totals of profits and losses from both the RTM Fund and the Fleckenstein Account. Dickson concluded that these spreadsheets demonstrated improprieties on the part of Fleckenstein; namely, that Fleckenstein had been allocating profitable trades made from the RTM Fund's assets into the Fleckenstein Account, but assigning losing trades to other investors, including Moross. Dickson confronted Fleckenstein with his suspicions about this so-called "cherry-picking" of trades. Thereafter, Fleckenstein transferred $221,500 from his own personal account to the RTM Fund. Fleckenstein did this, according to his declaration, to equalize the short-selling losses for both accounts during that calendar quarter "so no one could say the Fleckenstein Account had done better trading securities than the RTM Fund" during that time.

Dickson received his pro rata share of this transfer, which was approximately $2,000. Dissatisfied with Fleckenstein's response as compared to the total losses that Dickson had incurred,

Dickson withdrew Moross from the RTM Fund. Moross then received approximately $75,000, which was all that remained from its original investment of $750,000.

## B.     The complaint

In November of 2001, Moross brought suit against the defendants. Based on the spreadsheets furnished by Fleckenstein, Moross alleged that when trades earned profits, Fleckenstein assigned these profits to the Fleckenstein Account, while losses were assigned to the RTM Fund investors. The complaint further alleged that when "Dickson telephoned Fleckenstein to inquire about these 'suspicious' trades[,] Fleckenstein admitted his wrongdoing and advised Dickson's agent that he would refund to Dickson his initial investment." According to the complaint, Fleckenstein reneged on this promise, but later disgorged $221,500 and applied it to the RTM Fund.

Moross's complaint enumerated four grounds for relief. First, Moross alleged that Fleckenstein violated the MUSA by "misrepresenting how profits and losses in the Fund were to be allocated and failing to disclose his plan to keep profitable trades in his own account." Moross claimed that it invested in the RTM Fund in reliance on the fact that Fleckenstein would "act consistent with his fiduciary duties as managing member of Fleckenstein Capital and General Partner of the Fund." Next, Moross's complaint sought an accounting of all trades made by Fleckenstein with money from his own account and for the accounts of his affiliated entities, in addition to an accounting "as to how all Fund profits and losses were allocated during the period of time that [Moross] was an investor in the Fund." Moross's two remaining claims of fraud and breach of fiduciary duty were similarly based on the alleged false representations made in the Offering Memo regarding how defendants would allocate the profits made with the RTM Fund's assets.

## C.     Testimony and proceedings below

In April of 2002, the defendants moved to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to plead fraud with particularity and for failure to state a claim, respectively. Moross, in opposition to the motion to dismiss, reiterated its claim of "cherry-picking" and argued that "over the brief period Dickson had access to the broker's spreadsheets, Fleckenstein's personal account flourished, while RTM lost most of its value." The district court found that Moross's factual allegations were sufficient to survive a Rule 12(b)(6) motion and that Moross had pled fraud with sufficient particularity.

Deadlines for completing discovery and amending the complaint were initially set for November of 2002, but the district court extended this deadline until March of 2003. Moross attempted to demonstrate its cherry-picking claim using a "representative sample" of Fleckenstein's trading records. The defendants produced more than 9,000 pages of documents, including the RTM Fund's daily records and financial audits conducted by the accounting firm of Ernst & Young.

Moross was asked in several interrogatories to identify the trades that it believed were improperly assigned as part of Fleckenstein's alleged cherry-picking scheme, but it never provided answers to these interrogatories. In April of 2003, the defendants moved for summary judgment on the grounds that Moross "has not identified in its answers to interrogatories any securities trades that Mr. Fleckenstein allegedly cherry picked" and that there was no evidence in the record of a cherry-picking scheme. Moross's response, filed in May of 2003, included an affidavit by William A. Collison that purported to demonstrate that factual disputes existed as to the cherry-picking claim.

Collison, whom Moross describes as a "security industries expert," spent approximately eight and a half hours reviewing the files in this case. He averred, in relevant part, that

[a]lthough the RTM Fund Confidential Private Offering Memoranda [*sic*] permitted Fleckenstein to maintain and invest funds in his own name, it articulated a very specific investment strategy. Despite a purported consistent, unified investment strategy and discipline, Fleckenstein's personal account inexplicably out performed the RTM Fund. For example, on February 29, 2002, the RTM Fund lost 8.03% that day, while Fleckenstein's personal account gained 1.23%. That same day, the RTM Fund was down 22.72% for the year, while Fleckenstein's personal account was up 38.44%. The disparity in performance between the RTM Fund and Fleckenstein's personal account exceeded an astonishing 71%. This fact alone constitutes circumstantial evidence that Defendants committed acts of "front running" and "cherry picking."

Moross's response also included a new factual basis for its claims of fraud and breach of fiduciary duty: that "[a]lthough Defendant, William Fleckenstein, was a director of Pan American Silver Corp. and a holder of approximately 60,000 warrants in that company's stock (material facts omitted from the Offering Memoranda and Amendments), as the investment manager and primary trader for the RTM Fund, Fleckenstein proceeded to acquire in excess of 500,000 shares of Pan American Silver Corp. in the RTM Fund as of December 31, 1999." This was the first time that Fleckenstein's association with Pan American Silver was mentioned by Moross.

In their reply memorandum, the defendants asserted that Fleckenstein's alleged failure to disclose material information relating to his status as a director of Pan American Silver was not mentioned in the complaint. The defendants also argued that there was no "evidence that Mr. Fleckenstein was not permitted to serve as a director on a company board or buy that company's securities either for the RTM Fund or for the Fleckenstein account while serving as director." In addition, the reply memorandum described Collison's affidavit as containing "conclusory assertions" and noted that Collison did not actually identify any cherry-picked trades.

The defendants also filed a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. They claimed that (1) Moross had prolonged this action even after the trading records failed to reveal evidence of cherry-picking, and (2) Dickson, in response to being asked to identify cherry-picked claims, threatened to call the SEC and informed the defendants that he "was prepared to make this case even more expensive for Defendants in the coming year (2003)."

In July of 2003, the district court held a hearing on the defendants' motion for summary judgment. Although the court found that Moross was "not even close" to isolating transactions that were alleged to have been improperly assigned to or transferred from the RTM fund, Moross was given an additional 75 days to locate cherry-picked trades in the discovery materials.

Two months later, Moross submitted a letter by Paul Moulden, who was identified as a "Senior Consultant" with Economics Analysis Group, Ltd. of Washington, D.C. The letter did not specifically identify any cherry-picked trades, but concluded that, based upon Moulden's analysis of a sampling of trades from one calendar quarter, Fleckenstein had engaged in the improper assignments of trades.

Moulden stated in deposition testimony that his report was based on a methodology that did not determine whether trades were being switched out of the RTM Fund once a trade was completed and found to be actually profitable, but instead analyzed "the way in which trades were being allocated on the day they were executed." Further, "[t]he analysis really was based on the price of the securities at the time the allocations were made [i.e., before the trade was completed], as opposed to the ultimate profitability of the beginning and ending—opening and closing transaction." In other words, Moulden calculated the theoretical profit of a trade at the time that Fleckenstein chose to allocate the trade to either the RTM Fund or his personal account, but did not calculate whether a

trade allocated into either account in fact was profitable when completed. This methodology, according to Moulden, would determine whether Fleckenstein was purposely allocating losing trades to the RTM Fund. On the basis of his analysis, Moulden concluded that "[a]llocation decisions were made that caused losing trades [as defined by Moulden's theoretical analysis] to primarily be allocated to the RTM Fund."

The district court found that Moulden's report "carries [Moross] across the threshold of establishing that there may be a genuine issue of a material fact." For that reason, and "for administrative convenience," the court denied the defendants' motion for summary judgment in July of 2004. The court also denied the defendants' motion for sanctions, stating that "I traditionally do not award sanctions."

Discovery continued, and the defendants procured a court order requiring Dickson to appear so that they could depose him. Dickson testified in his deposition that he was "not capable" of identifying either profitable trades that were "switched from the RTM Fund to the Fleckenstein Account in [the] representative sample that forms the basis of plaintiff's claims" or losing trades that were "switched from the Fleckenstein Account to the RTM Fund." After both Dickson and Moulden were deposed, the defendants renewed their motion for summary judgment in February of 2005.

In their renewed motion, the defendants argued that (1) documentary discovery had yielded no evidence of cherry-picking or fraud, (2) the methodology used by Moulden in calculating "theoretical profits and losses" was flawed and his small sample of the voluminous trading records was insufficient, (3) any claims regarding self-dealing in Pan American Silver shares were not asserted in the complaint and were time-barred, and (4) Fleckenstein was permitted by the Offering Memo to serve as a director of Pan American Silver and Dickson had been informed of the directorship.

Moross responded to the defendants' renewed motion for summary judgment by filing a cross-motion for partial summary judgment. For the first time, Moross included the fact that the defendants' 1996 Form ADV—a document that Fleckenstein Capital, as an investment advisor, was required to file with the SEC—failed to acknowledge that Fleckenstein Capital would be recommending "to clients that they buy and sell securities in which [Fleckenstein Capital] has some financial interest." The RTM Fund had in fact purchased securities in Pan American Silver, of which Fleckenstein was a director. This alleged misrepresentation by omission formed the basis of Moross's motion for partial summary judgment. Moross also maintained its position that there were sufficient factual issues for the district court to deny summary judgment to the defendants on Moross's cherry-picking claim.

The district court resolved these conflicting motions by granting summary judgment to the defendants on all aspects of Moross's claims. As to the cherry-picking claim, it stated that "[w]hile up to this point the Court had given Moross every indulgence in letting its cherry-picking claim go forward, the time has come for it to end." The court held that Moulden's report was "seriously flawed" because it analyzed only one third of the trades from a single calendar quarter out of the eight trading quarters during which Moross invested in the RTM Fund. It also discredited the report because, according to the district court, Moulden "admitted he guessed" whether trades were profitable or unprofitable, and Moulden's concept of "theoretical" profits and losses was too speculative to overcome summary judgment against Moross. The court held that "[i]t is not enough to overcome summary judgment by broadly asserted [*sic*] that Moulden's opinion creates a genuine issue of material fact."

In dismissing Moross's cherry-picking claim, the district court relied in part on a letter written to Moross by the Securities Division of the state of Washington's Department of Financial Institutions. Moross had filed a complaint with the agency in February of 2005. In response, the

Securities Division reviewed Moulden's report and conducted "additional field work on the allocation question." According to the Securities Division,

> in order to make a case that improper allocations have been made, we need to be able to establish that the allocations were made after it was known which trades had made money and which had lost money. The report of your expert [Moulden] does not address timing of the allocation of the trades. Our field examiner also found no evidence that trades were allocated to accounts after it was known which trades had been profitable. We therefore do not have the evidence we would need to bring an action against [the] advisor for improper allocation of trades.

The district court concluded that this letter from the Securities Division further discredited Moulden's expert testimony.

In addition, the district court dismissed Moross's accounting claim because the defendants had already produced daily reports of the RTM Fund's trading activity, and Moross failed "to articulate what additional information it needs for its equitable accounting claim." The court further granted summary judgment on Moross's "eleventh-hour newly-minted claim" that Fleckenstein breached his fiduciary duty by failing to disclose his involvement with Pan American Silver on the 1996 Form ADV. According to the court, Fleckenstein did not become a director of the company until 1997, so the 1996 Form ADV did not contain any material omissions. In addition, Moross did "not identify or explain the source of the [1996 Form ADV], nor was the form part of the initial offering materials or ever before referred to in the many prior filings in this case." Fleckenstein, moreover, had sent Dickson a letter in 1997 specifically disclosing his new status as a director. The court therefore found that Moross had not produced enough evidence to create a genuine issue of material fact as to any of its claims against the defendants.

## II. ANALYSIS

### A.     Standard of review

We review the district court's grant of summary judgment de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B.     Cherry-picking

The MUSA prohibits "any person, in connection with the offer, sale, or purchase of any security, directly or indirectly . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Mich. Comp. Laws § 451.501. In addition, the MUSA renders unlawful "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading." Mich. Comp. Laws § 451.810(a)(1).

Common law fraud requires proof of the same basic elements as a claim under the MUSA; namely,

(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*U.S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 82 (Mich. 1981) (quotation marks omitted). The common law further imposes an obligation on fiduciaries to act in their clients' best interests and to not betray their clients' confidence. *See Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 309 N.W.2d 645, 648 (Mich. 1981); *see also Rose v. Nat'l Auction Group, Inc.*, 646 N.W.2d 455, 464 (Mich. 2001) ("A breach of fiduciary duty claim requires that the plaintiff reasonably reposed faith, confidence, and trust in the fiduciary.") (citation and quotation marks omitted) (emphasis omitted).

Moross alleged in its complaint that the defendants violated the MUSA, committed fraud, and breached their fiduciary duties by "misrepresenting how profits and losses in the Fund were to be allocated and failing to disclose [Fleckenstein's] plan to keep profitable trades for his own account." According to Moross, "[a]t the end of the trading day, Fleckenstein, as manager of both his personal account and RTM, assigned 'winning' trades to his own personal account, while 'losers' were assigned to RTM."

On appeal, Moross devotes little attention to its cherry-picking claim. It does argue, however, that "fact issues persist" with respect to the cherry-picking claim based on both Moulden's expert report and the defendants' voluntary transfer of $221,500 to the RTM Fund once Dickson voiced his suspicions of improper trading. The testimony of Collison, Moross's other expert, is not mentioned in Moross's briefs, and Collison actually was removed from Moross's witness list that was filed with the district court.

Despite the allegations in the complaint that Dickson "discovered" cherry-picked trades, Dickson's deposition testimony reveals that he was unable to identify any trades that were improperly allocated to either the RTM Fund or Fleckenstein's personal account. We are thus left to consider whether the evidence of Fleckenstein's voluntary transfer and the expert report by Moulden are enough to create a genuine issue of material fact on this issue.

Moulden's evidence of "theoretical profits" does not support a claim that defendants improperly allocated trades *after* they were completed and profitable. The report, however, could provide circumstantial evidence that Fleckenstein monitored trades made with unassigned funds for a brief period of time and then allocated the trades to either his own account or the RTM Fund once he determined whether they were likely to be profitable. Moulden's report is thus supportive of a claim that the defendants engaged in the manipulation of trades in which those that were likely to be profitable (based on an examination of short-term performance after the purchase of the trade) were assigned to Fleckenstein's account and those likely to lose money were assigned to the RTM Fund. After years of discovery, however, Moross has never been able to articulate the precise nature of his cherry-picking claim or how Fleckenstein allegedly manipulated trades.

Although "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility," *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quotation marks omitted), Moulden's analysis still does not explain the mechanism through which Fleckenstein allegedly engaged in improper activity. Moross's complaint charges that Fleckenstein allocated profitable trades to his own personal account, while losses were assigned to the RTM Fund investors, including Moross. Moulden's report, however, does not address this type of cherry-picking. Moulden's analysis is especially deficient given the high degree of regulation to which Fleckenstein was subjected as the fund's manager. The Securities Division of

Washington's Department of Financial Institutions came to a similar conclusion when it wrote that Moulden's report "does not address timing of the allocation of the trades."

In *SEC v. Slocum, Gordon, & Co.*, 334 F. Supp. 2d 144 (D.R.I. 2004), the SEC was permitted to present a "thorough analysis of [the defendant's] trades over the relevant period [in order to reveal] certain trends in firm security purchases supporting an inference of cherry picking. . . ." *Id.* at 172. Moulden's circumstantial evidence of cherry-picking, however, is not thorough, nor does it reveal a pattern of behavior or disparities in performance between the RTM Fund and Fleckenstein's personal account. In fact, Fleckenstein's account performed almost as badly as the RTM Fund for the full calendar year of 1999, and worse than the RTM Fund in 2000. We therefore agree with the district court that Moulden's report does not create a genuine issue of material fact.

Evidence that Fleckenstein voluntarily transferred $221,500 to the RTM Fund also fails to provide a sufficient basis for a jury to rule in favor of Moross. This one fact, which can be interpreted either as an admission of wrongdoing or as a means to avoid the appearance of impropriety, is not enough to allow a rational trier of fact to find for the plaintiff by a preponderance of the evidence, especially when compared to all of the evidence that weighs against a conclusion of cherry-picking. *See Anderson*, 477 U.S. at 252 (holding that the summary judgment "inquiry, therefore, unavoidably asks whether reasonable [factfinders] could find by a preponderance of evidence that the plaintiff is entitled to a [judgment]"); *see also Knecht v. Collins*, Nos. 96-3682, 96-3735, 96-4114, 1999 U.S. App. LEXIS 13645, at *12 (6th Cir. June 15, 1999) (unpublished) (holding that a plaintiff's speculative evidence "is not enough to survive summary judgment or for a rational trier of fact to conclude by a preponderance of the evidence that a due process violation has taken place").

The district court further held that Moross had not provided any coherent theory or evidence to support the calculation of damages, which Moross must prove in order to succeed on its claims. Finally, Moross's argument that the district court improperly relied on the Securities Division's letter, which "fails to address in any meaningful way the scope of the Division's investigation; the methodology of the investigation; the witnesses interviewed; or the standard of the review," is without merit. The district court did not even mention the letter until after the court had already determined that Moulden's methodology was "seriously flawed" for a variety of reasons. We therefore conclude that the district court did not improperly consider the letter. In sum, Moross had four years to produce reliable evidence of cherry-picking, either direct or circumstantial, and it failed to do so.

## C.     Misrepresentations relating to the 1996 Form ADV

On appeal, Moross dedicates the majority of its attention to the alleged misrepresentations on the 1996 Form ADV. Moross claims that Fleckenstein's 1996 Form ADV contained material omissions regarding his involvement with Pan American Silver and that Fleckenstein failed to disclose his practice of trading in securities for himself "that were also being bought, sold, or recommended for clients." The district court "put[] aside defendants' arguments that this claim is barred by Moross' failure to plead it within the statute of limitations." It held that (1) Fleckenstein did not have a duty to disclose his position in Pan American Silver because "Moross received the offering materials in December 1996, more than 5 months before Fleckenstein became a director in Pan American Silver," and (2) "the Form ADV itself shows that Fleckenstein disclosed his intention to buy or sell securities also recommended to clients."

The defendants correctly assert that the "complaint contains no reference of any kind either to Mr. Fleckenstein's position as director of Pan American Silver Corporation or to Mr. Fleckenstein's ability to make investments in his own name along with investments for the RTM Fund." Moross argues that the district court should have permitted it to amend its complaint to

include these claims, but there is no evidence in the record that Moross sought such an amendment. Instead, Moross first mentioned these claims in May of 2003 as part of its response to the defendants' motion for summary judgment.

Even if Moross had sought to amend its complaint, the claims would have been barred by Michigan's three-year statute of limitations for breach of fiduciary duty and six-year statute of limitations for fraud. *See* Mich. Comp. Laws § 600.5805(8), (10); *Boyle v. Gen. Motors Corp.*, 661 N.W.2d 557, 559 n.3 (Mich. 2003) (holding that "a plaintiff now has, in any case, the full period of six years from the date of the fraudulent act" to bring an action for fraud); *Miller v. Magline, Inc.*, 256 N.W.2d 761, 774 (Mich. Ct. App. 1977) (stating that a breach of fiduciary duty claim sounds in tort and is governed by the three-year statute of limitations under Michigan law). The Form ADV and the Offering Memo—Moross's basis for these new claims—were submitted in 1996, over six years before Moross's introduction of the claims in his 2003 response to the defendants' motion for summary judgment. Moross argues, however, that these claims would "relate back" to the date of the filing of the original complaint.

Under Rule 15(c)(2) of the Federal Rules of Civil Procedure, an amended complaint relates back to the original complaint when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Moross's claims of misrepresentation and lack of disclosure about self-dealing, however, allege completely different conduct from the conduct underlying its claim of cherry-picking. The Form ADV claim alleged misrepresentations and omissions made in the defendants' offering materials, whereas the cherry-picking claim alleged the purposeful allocation of unprofitable trades to the RTM Fund. In addition, Moross's new claims do not constitute "added events leading up to the same injury" or "an added theory of liability for the same occurrence." *See Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 248-49 (6th Cir. 2000) (citation and quotation marks omitted) (discussing Rule 15(c)(2)). The new claims, which raise the issue of whether the defendants properly adhered to the statements made in their offering materials regarding self-dealing, involve a completely different set of factual disputes from the circumstances regarding the cherry-picking claim.

Finally, "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision" of whether an amended complaint relates back to the original. *Hageman v. Signal L.P. Gas*, *Inc.*, 486 F.2d 479, 484 (6th Cir. 1973). Moross waited a year and a half after filing its complaint before inserting the Form ADV claims of misrepresentation and self-dealing into a response to the defendants' motion for summary judgment. As the defendants argue, "[i]t was as if Plaintiff at the last minute had simply pulled the form out of thin air." The undue delay in raising the Form ADV claims and their likely futility due to the statute of limitations support the district court's decision to grant the defendants' motion to dismiss.

## D.     Claim for accounting

Moross further requested that the defendants provide an equitable accounting so that it could "determine the basis for the limited credit previously provided by Defendants." But the defendants have already produced all of the trading records from the RTM Fund and the Fleckenstein Account for the entire period that Moross was an investor in the RTM Fund. In addition, the defendants provided Moross with accounting records prepared by Ernst & Young, the defendants' accountant. Because the district court properly held that Moross "fails to articulate what additional information it needs for an equitable accounting claim," we find no error in the district court's grant of summary judgment on this claim.

### E.     Motion for sanctions under Rule 11 and 28 U.S.C. § 1927

In June of 2003, the defendants moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure, which provides that an individual who files a pleading or brief with a federal court "is certifying that to the best of the person's knowledge, information, and belief" that the factual allegations have evidentiary support. Fed. R. Civ. P. 11(b)(3). The defendants claimed that Moross knew that it could not support its cherry-picking claim when it filed this action and that it then refused to dismiss the claim even after discovery revealed no evidence of cherry-picking. On appeal, the defendants further contend that Moross "falsely represented that Mr. Dickson personally discovered facts supporting a cherry picking claim in the Complaint."

The defendants also moved for sanctions under 28 U.S.C. § 1927, which provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." According to the defendants, Moross has vexatiously multiplied the proceedings by pursuing a frivolous cherry-picking claim and adding other claims at the last minute. The district judge denied the defendants' motion for sanctions, commenting that "I traditionally do not award sanctions."

Although the denial of a motion for sanctions is reviewed under the abuse-of-discretion standard, this circuit has remanded close questions regarding a motion for sanctions where a district court denies sanctions without explanation. *See Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1377 (6th Cir. 1991) (remanding the denial of sanctions because, "particularly in the close or serious sanction cases, . . . the district court should set out its analysis and discrete findings with respect to its decision on the allowance or rejection of sanctions") (quotation marks omitted). Appellate courts in other circuits have also found an abuse of discretion where the district court denies sanctions in a close case with no explanation. *See, e.g.*, *S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996) ("When the requesting party makes a strong showing that Rule 11 violations may have occurred, . . . the district court should provide some explanation for disregarding the proffered showing.")

In the present case, the district court was remiss in not providing some explanation for denying defendants' claim that Moross was purposely prolonging this litigation in order to increase the defendants' legal expenses. The issue of sanctions is not so close, however, that the district court's lack of explanation constitutes an abuse of discretion. Sanctions are awarded where an attorney pursues claims that he should know are "frivolous." *Tareco Props, Inc. v. Morriss*, 321 F.3d 545, 550 (6th Cir. 2003). In this case, Moross provided the expert testimony of Paul Moulden in order to demonstrate circumstantially that Fleckenstein did not allocate trades to either his own account or the RTM Fund until he had forecasted their likelihood of profitability. The $221,500 voluntary transfer on the part of Fleckenstein, moreover, can be seen as raising at least an inference of consciousness of guilt. We therefore find that the district court did not abuse its discretion in denying the defendants' motion for sanctions.

### F.     Sanctions for this appeal

The defendants have also moved for sanctions under Rule 38 of the Federal Rules of Appellate Procedure, which provides that a court of appeals may award "just damages and single or double costs to the appellee" if it determines that an appeal is frivolous. An appeal is frivolous where an appellant "essentially had no reasonable expectation of altering the district court's judgment based on law or fact." *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 677 (6th Cir. 1999).

Although we agree with the district court that Moross's evidence is insufficient to survive summary judgment, a close enough question is presented to allow this appeal to escape categorization

as frivolous.   In addition, despite Moross's Form ADV claim ultimately proving meritless, the district court declined to decide whether it was barred by the statute of limitations.  The district court's focus on the merits of the Form ADV claim permitted Moross to reasonably believe that the statute of limitations issue was a close question.

We therefore deny the defendants' motion for sanctions under Rule 38. As the prevailing parties, however, the defendants will be entitled to recover the normal costs of this appeal.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court, but **DENY** the defendants' motion for sanctions on appeal.