**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0259n.06**
**Filed: April 6, 2007**

**No. 06-5634**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JIMMY STRATTON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| KEVIN WOMMACK, individually, and d/b/a | ) | COURT FOR THE MIDDLE |
| Loophole Entertainment, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| _____ | ) | |

BEFORE: GUY, SUHRHEINRICH, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Jimmy Stratton was under contract to manage the band known as Los Lonely Boys ("the Boys"), which consists of the three Garza brothers. In October 2003, Stratton filed an action in federal court claiming that defendant Kevin Wommack violated Tennessee law by tortiously inducing the Garzas to breach their management agreement ("the contract") in late 1999 or early 2000. The district court granted summary judgment to Wommack on the ground that Stratton failed to file his claim within the three-year period required by TENN. CODE ANN. § 28-3-105. Stratton timely appealed. Stratton agrees that § 28-3-105 applies, but he contends that his cause of action did

–1–

not accrue until he read newspaper and website articles in 2003 that gave him reason to believe that Wommack, rather than others, was involved in the tortious inducement.

For the reasons that follow, we vacate the grant of summary judgment and remand for further proceedings. Under Tennessee law, a tort cause of action does not necessarily accrue at the time the plaintiff knows that he has suffered an injury. A tort cause of action does not accrue until the plaintiff also knew, or reasonably should have known, "the occasion, the manner and means by which a breach of duty occurred that produced his injury" and *"the identity of the defendant who breached the duty."* *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982) (emphasis added). Contrary to this rule, the district court failed to consider whether there was a genuine issue as to whether reasonably diligent investigation would have led Stratton to discover Wommack's inducement of the Garzas' breach less than three years before he filed this action. The district court should have made that fact-sensitive determination in the first instance.

## I.

The complaint alleges that Stratton is a resident of Tennessee and Wommack is a resident of Texas,[1] and that Wommack's tortious interference caused Stratton to lose over $100,000 in commissions and $70,000 in unreimbursed expenses, i.e., more than $75,000 exclusive of interest and costs. Accordingly, it appears that the district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

---

[1]Wommack's answer, filed in January 2004, is not in the appellate record. But Wommack never moved to dismiss for lack of subject-matter jurisdiction, and neither his summary judgment briefs below nor his appellate briefs challenge the existence of diversity jurisdiction.

II.

In November 1996, Stratton entered into an Artist-Manager Agreement[2] with the Garzas / Los Lonely Boys. Stratton agreed to

> advise and counsel [the Garzas] in matters pertaining to music, music publishing and musical performance; publicity; public relations and advertising; . . . compensation and privileges for similar artistic values; . . . the selection of booking and/or theatrical agencies, and persons, firms and corporations who will counsel, advise, seek and procure employment and engagements for Artist; and with regard to general practices in the music and entertainment industry as are called for by this Agreement.

Agreement ¶ 3. The Garzas agreed to pay Stratton a 20% commission and reimburse travel and other expenses directly related to his representation of the group. Agreement ¶¶ 7-8.

In April 1999, Stratton entered into a Memorandum of Understanding ("MOU") with the Garzas which superseded the 1996 Agreement. The MOU was to last for five years, with an additional two years at Stratton's option.

In early 1999, two record producers from Chicago, Jim Tullio and Rob Fabroni, contacted Stratton after hearing a Los Lonely Boys CD and said they wanted to see the Garzas perform. Tullio and Fabroni traveled to Florida and saw the Garzas perform live. Sometime between April and September 1999, the Garzas and Stratton went to Chicago to meet with Tullio and Fabroni. At that meeting, Tullio and Fabroni allegedly criticized Stratton's management in the presence of the Garzas.

---

[2]Wommack appears to question the validity of the 1996 and 1999 agreements, calling them "purported" contracts. We assume *arguendo* that the agreements were valid, enforceable contracts.

From September 21 through November 29, 1999, the Garzas' counsel wrote three letters to Stratton's counsel requesting a detailed written accounting of all commissions Stratton had received and all expenses he had charged to the Garzas' account while under the management agreements. Stratton did not provide the requested accounting.

Unbeknownst to Stratton, sometime in November or December 1999, record producers Tullio and Fabroni invited Wommack to see the Garzas perform live in Nashville. Wommack thus traveled from Texas and viewed the performance; however, the Garzas did not introduce Stratton to Wommack.

In late 1999, the Garzas left Nashville and returned home to Texas without giving Stratton any advance warning, and thereafter they had no further contact with Stratton. The Garzas failed to honor some personal appearances and concerts which Stratton had scheduled and committed them to perform, including a Christmas party for the Academy of Recording Arts and Sciences on December 13, 1999. Even when they did perform at scheduled concerts, they failed to pay Stratton any commissions. The Garzas also failed to record music with one David Rifkin, as Stratton had arranged. Likewise, the Garzas did not perform at a BMI Showcase in Nashville on January 6, 2000.[3]

In March 2000, the Garzas' counsel wrote to Stratton's counsel and stated that the Garzas were terminating their agreement with Stratton effective immediately. The Garzas cited Stratton's refusal to provide the requested accounting as a material breach.

---

[3]The Garzas' counsel asked about January 6, *1999*, but that cannot be correct according to either side's version of events. He must have meant to refer to January 6, *2000*.

Later that month, Stratton's counsel wrote back, stating that the agreement remained in effect, that their failure to perform was complicating his attempt to provide an accounting, and that he would provide an accounting "in a reasonable time." Stratton also stated that he was

> further concerned that there are third parties that may have gained the collective ear of the band and may be at the root of Los Lonely Boys' desire to walk away from the person who has expended great sums of personal funds and who has deferred his rightful payment for services rendered, to bring this band through the development stage. We will continue our investigation into this aspect of the case.

According to the Boys' father, he took over the management of the group after "the fallout" with Stratton, which he placed as occurring in "2000 sometime." Mr. Garza testified that Wommack began handling the group's bookings after they terminated their agreement with Stratton and was paid a 15% commission on any performances that he booked. Mr. Garza testified, however, that Wommack was not their "manager" per se at the time of the deposition, in April 2002.

In May 2002, the Garzas entered into a formal written agreement for Wommack to manage the Boys for seven years at a 20% commission. Stratton alleges that he did not become aware that Wommack was managing the Garzas until he saw an August 2003 *Austin American-Statesman* article that referred to Wommack as their manager. The same article quoted Wommack as saying that in the late 1990s, he "went back to the [Garzas'] apartment" after he saw them perform in Nashville and concluded that "[t]he first thing we had to do was get them in a studio."

At an unspecified time – presumably after reading the August 2003 Austin newspaper article – Stratton visited the Latin music website www.batanga.com and found an article that quoted

Wommack as stating that when he met the Garzas in Nashville in December 1999, he was so impressed that "he **persuaded** [the Garzas] to return to Texas for further career development."

### III.

Stratton filed a complaint in the United States District Court for the Middle District of Tennessee in October 2003, claiming that Wommack induced the Garzas to breach their agreements with him in violation of Tennessee law. In January 2004, Wommack filed an answer that asserted a Tennessee three-year statute of limitations as an affirmative defense. Wommack filed a summary judgment motion, which the district court granted in April 2006. Stratton filed a motion for reconsideration, which the district court denied, and Stratton timely appealed.[4]

### IV.

We review the district court's entry of summary judgment de novo. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005). A district court's interpretation of state law is likewise governed by the de novo standard. *Id*.

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 515 (6th Cir. 2006) (citing FED. R. CIV. P. 56(c)). We must construe the evidence in

---

[4]In 2001, the Garzas sued in state court for a declaration that they were entitled to terminate their management agreements with Stratton, who counterclaimed for breach of those agreements. *See Joey Garza et al. v. Jimmy Stratton*, No. 10873 (Tenn. Chancery, Davidson Cty.) (Kilcrease, Chancellor). Westlaw does not have any opinions or orders from that case, but the docket sheet indicates that in July 2006 the state court issued an amended scheduling order setting a jury trial for February 2007. The Garzas filed a second amended complaint on December 6, 2006, but counsel stated at oral argument that trial is still scheduled for February 2007.

the light most favorable to the non-movant and draw all reasonable inferences therefrom in its favor. *Moross*, 466 F.3d at 515 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (citing *Anderson*, 477 U.S. at 252).

We usually review the denial of a Rule 59(e) reconsideration motion only for abuse of discretion. *Intera Corp. v. Henderson*, 428 F.3d 605, 619 (6th Cir. 2005) (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 518 (6th Cir. 1998)), *cert. denied*, – U.S. –, 126 S. Ct. 1782 (2006). When the motion seeks reconsideration of an order granting summary judgment, however, we conduct de novo review. *Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 637 (6th Cir. 2004).

V.

Stratton filed the complaint on October 21, 2003. The parties agree that Stratton's claim is governed by TENN. CODE ANN. § 28-3-105, which is entitled "Torts; property" and provides,

> *The following actions shall be commenced within three (3) years from the accruing of the cause of action*:
>
> (1)      *Actions for injuries to personal* or real *property*;[5]

---

[5]It may seem strange to call a claim for tortious interference with contract an action for injury to personal property. Under Tennessee law, however, "[a]n 'injury to property' need not be physical . . . just as an injury to the person is not limited to bodily injury." *Keller v. Colgems-EMI Music,*

(2)     Actions for the detention or conversion of personal or real property; and

(3)     Civil actions based on the alleged violation of any federal or state statute creating monetary liability for personal services rendered . . . .

Emphasis added.[6]

We agree that the Tennessee appellate courts would apply this three-year period to a claim

for tortious inducement of breach of contract under these circumstances.  This court has previously

concluded that Tennessee courts would apply § 28-3-105's three-year limitations period to both

---

*Inc.*, 924 S.W.2d 357, 359 (Tenn. Ct. App. 1996).

The Tennessee Supreme Court developed a test for distinguishing between injuries to the person, governed by the one-year period of § 28-3-104, and injuries to property, governed by the three-year period of § 28-3-105.  Injuries to the person are injuries "caused by invasion of rights that 'inhere in man as a rational being' or rights that one is entitled to by simply being a person in the eyes of the law [i.e., natural rights]." *Sudberry v. Royal & Sun Alliance*, No. M2005-00280-COA-R3-CV, – S.W.3d –, 2006 WL 2091386, at *3 (Tenn. Ct. App. July 27, 2006) (bracketed text added) (quoting *Gunter v. Lab. Corp. of America*, 121 S.W.3d 636, 642 (Tenn. 2003) (citing *Brown v. Dunstan*, 409 S.W.2d 365, 367 (Tenn. 1966))), *app. denied* (Tenn. Nov. 20, 2006).  "These rights are distinguished from rights that exist by virtue of property ownership or contract." *Id.*

[6]There were at least two alternatives. TENN. CODE ANN. § 28-3-104(a)(1) provides a one-year limitations period for, *inter alia*, "actions . . . *for injuries to the person* . . . ." (emphasis added.) Only one district court decision in our circuit has applied this one-year limitations period to a claim for tortious interference with contractual relations or similar claim, and it provided neither discussion nor authority in support of that holding.  *Carlson v. Highter*, 612 F. Supp. 603, 605 (E.D. Tenn. 1985).

TENN. CODE ANN. § 28-3-110(3) provides a ten-year limitations period for "[a]ll other cases not expressly provided for."  This catch-all provision does not apply because, as discussed herein, the Tennessee courts hold that TENN. CODE ANN. § 28-3-105 governs claims for tortious interference with contract or with a business relationship.  Moreover, our court has rejected the notion that the ten-year catch-all applies to such claims under Tennessee law. *See Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 204-05 (6th Cir. 1986).

statutory and common-law claims for tortious interference with contract, business relationship, or employment. *See Caruthers Ready-Mix, Inc. v. Cement Masons Local Union No. 520*, 779 F.2d 320, 323-25 (6th Cir. 1985) (subcontractor's claim that union engaged in strikes against general contractors in order to discourage them from dealing with the subcontractor); *Harvey v. Martin*, 714 F.2d 650, 651-52 (6th Cir. 1983) (common-law tort claim against union and union official for wrongfully inducing the Postal Service to breach his employment contract). Our district courts sitting in Tennessee, which have the most occasions to study and apply Tennessee law, have also applied TENN. CODE ANN. § 28-3-105 to such claims. *See Smith v. Rosenthal Collins Group, LLC*, 340 F. Supp. 2d 860 (W.D. Tenn. 2004) (McCalla, J.) (statutory claim for procurement of breach of contract and to common-law claims for tortious interference with contract and with business relationship); *Mountain Mktg. Prof'ls, Inc. v. Fairfield Resorts, Inc.*, No. 3:04-CV-231, 2005 WL 3263282 (E.D. Tenn. Dec. 1, 2005) (Jarvis, J.).

A review of the Tennessee decisions confirms that this court has been right to choose § 28-3-105 to govern such interference claims. *See, e.g., Collins v. Greene Cty. Bank*, 916 S.W.2d 941, 947 (Tenn. Ct. App. 1995) (borrower's claim that lender tortiously interfered with borrower's business relationship with third party) (citing *Gifford v. City of Gatlinburg*, 900 S.W.2d 293 (Tenn. Ct. App. 1995), *overruled on other grounds by Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001)); *Nelson v. Metric Realty, Inc.*, No. M2000-03204-COA-R3-CV, 2002 WL 31126649 (Tenn. Ct. App. Sept. 26, 2002) (tortious interference with contract claim against party that allegedly procured breach

of settlement agreement); *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Dist. Co.*, 1986 WL 622, at *3 (Tenn. Ct. App. Jan. 2, 1986).

## VI.

Because the Tennessee Legislature has not defined what constitutes accrual of the cause of action for purposes of § 28-3-105, judicial construction of the term is necessary. For over thirty years, the Tennessee Supreme Court has adhered to the discovery rule in tort actions, with exceptions not applicable here.[7] "[T]he cause of action accrues and the statute of limitations commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1975) (footnotes omitted). The Supreme Court explained that

> A cause of action accrues when a suit may be maintained upon it. A suit may not be brought upon a cause of action until it exists, and *a cause of action does not exist until all its elements coalesce.* In civil actions for damages, two elements must coalesce before a cause of action can exist: (a) a breach of some legally recognized duty owed by the defendant to the plaintiff; (b) which causes the plaintiff some legally cognizable damage.

*McCroskey*, 524 S.W.2d at 490 (internal citations omitted). The *McCroskey* decision did not address the situation where the plaintiff has some reason to know that he may have suffered an actionable wrong but does not know *who* has wronged him.

---

[7]For example, the discovery rule does not apply to toll the statutes of limitations governing defamation claims, *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818 (Tenn. 1994), or claims for conversion of a negotiable instrument absent fraudulent concealment, *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 624-25 (Tenn. 2002). The Tennessee Supreme Court has also laid out a general test to determine whether the seemingly blanket discovery rule announced in *McCroskey* might not apply to a certain type of tort claim, *see Quality Auto Parts Co.*, 876 S.W.2d at 820.

Seven years after *McCroskey*, the Tennessee Supreme Court provided some clarification in *Foster*, 633 S.W.2d at 305. Foster had dental work done in October 1975. When Foster became ill and unable to work in November 1975, he visited a doctor and had extensive tests performed, whereupon the doctor informed him in early January 1976 that he suffered from serum hepatitis, which can only be contracted through blood contact with a carrier. *Id.* at 304. Foster's complaint alleged that he and his doctors conducted a diligent search in an effort to determine how he might have come in contact with serum hepatitis, to no avail, until he returned to the same dentist in July 1976. At that time, the dentist told Foster that on Foster's previous visit, the dentist had accidentally cut his own finger and thereby commingled his blood with blood in Foster's lip. *Id.* Foster sued in state court seven months later, in February 1977, alleging medical malpractice. Under the one-year statute of limitations governing such claims, the trial court dismissed Foster's complaint as untimely because it was filed more than one year after he discovered that he had contracted hepatitis. *Id.*

The Tennessee Supreme Court reversed, holding that Foster's cause of action for negligence was timely because

> neither the injury nor the tortfeasor who perpetrated the injury were discovered until July 21, 1976. All that plaintiff discovered in January [1976] was the name of the disease. That discovery did not reveal that he contracted it through a negligent act or who the tortfeasor might be. In *McCroskey* . . . we [adhered to] the Hornbook principle that a cause of action in tort does not exist until a judicial remedy is available to the plaintiff . . . . It is axiomatic that *no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered*, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) *the identity of the defendant who breached the duty*.

*Foster*, 633 S.W.2d at 305 (emphasis added) (internal citation omitted); *see also Woods v. The Sherwin-Williams Co.*, 666 S.W.2d 77, 78-79 (Tenn. Ct. App. 1983) (citing *Foster*).[8]

Thus, the question becomes whether Stratton showed a genuine issue of fact as to when he "reasonably should have discovered . . . the identity of the defendant who breached the duty" – in this case, the duty not to induce the Boys to breach their agreement with Stratton. Put another way, could a reasonable factfinder conclude that if Stratton acted with due diligence, he still might not have discovered, by October 21, 2000, that *Wommack* induced the Boys to breach?

As the district court correctly noted, the Tennessee Supreme Court holds that a statute of limitations is tolled "only during the period when the plaintiff has no knowledge at all that a wrong has occurred, and, as a reasonable person, is not put on inquiry [notice]." *Hoffman v. Hosp. Affiliates, Inc.*, 652 S.W.2d 341, 344 (Tenn. 1983); *see also Potts v. Celotex Corp.*, 796 S.W.2d 678 (Tenn. 1990). The district court reasoned as follows,

> [T]he 1999 meeting of the Garzas, Tullio, Fabroni and Stratton provided notice of those third parties' critical view of Stratton's management of the Garzas. The 1999 letters to Stratton after that meeting, coupled with Stratton's concessions that the Garzas had abandoned their contract with him in 1999, placed Stratton on reasonable notice of third party influence and interference with the Garzas-Stratton management agreement. Stratton's counsel's admission in March, 2000 that Stratton deemed Tullio and Fabroni [to be] the sources of the Garzas['] "abandonment of their contract" with him, clearly triggered the commencement of the applicable statute of

---

[8]*See also Collins v. Edwards*, No. E2003-01508-COA-R3-CV, 2004 WL 1056137, at *3 (Tenn. Ct. App. May 10, 2004) (vacating limitations dismissal of medical-malpractice claim) ("The statute of limitations begins to run when the plaintiff is 'aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct', *and the plaintiff knows the identity of the person who engaged in that conduct*.") (emphasis added) (quoting *Jacobs v. Singh*, No. M2001-00697-COA-R3-CV, 2002 WL 27821, at *3 (Tenn. Ct. App. Jan. 11, 2002) (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 656-57 (Tenn. 1994))).

> limitations on Stratton's tortious interference claim based upon his relationship with the Garzas. With these admissions, Stratton cannot reasonably rely on the August, 2003 newspaper articles for [his argument that he did not know until then that he had a] claim against Womack.

Op. at 11-12.

As Stratton's March 2000 letter reflects, he believed that the Garzas had abandoned or breached their agreement with him by that time, and he was, in his own words, "concerned" that some third party had induced the Garzas to do so. We find that, because Tullio and Fabroni criticized Stratton's management performance in the presence of both the Garzas and Stratton in 1999, Stratton certainly was on inquiry notice, no later than March 2000, that *someone* had induced the Garzas to breach the agreement, and that the "someone" could well be Tullio and Fabroni.

But Stratton is not suing Tullio and Fabroni in this action; he is suing Wommack. Thus, the pertinent inquiry is when Stratton's cause of action *against Wommack* accrued. Under the Tennessee cases, that cause of action did not accrue until Stratton discovered, or reasonably should have discovered, not just the injury (the Garzas' breach), but also (1) the "occasion, manner and means" by which the Garzas were induced to breach, and (2) *evidence that it was Wommack who induced them to do so. Foster*, 633 S.W.2d at 305; *see Gilmore v. Davis*, 185 F. App'x 476, 482 (6th Cir. 2006) ("The appellees are confused because they conflate *facts* with *claims* under the discovery rule.") (reversing limitations dismissal of tort claims and citing *Hamblen v. Davidson*, 50 S.W.3d 433, 438 (Tenn. Ct. App. 2000) for proposition that knowledge of injury is not knowledge of claim).

The district court's opinion did not reflect consideration of this central question. Therefore, we vacate summary judgment and remand for the district court to determine, in the first instance,

whether Stratton can show a genuine issue of fact as to when he should have discovered that it was

*Wommack* who induced the Garzas to breach. "[W]hether a claim is barred by a statute of limitations

is 'a factually intensive claim that this court is ill-equipped to consider in the first instance.'" *Watt*

*v. United States*, 162 F. App'x 486, 497 (6th Cir. 2006) (quoting *First City Bank v. NCUA Bd.*, 111

F.3d 433, 439 (6th Cir. 1997)).[9]

There is little in the record as to when due diligence should have enabled Stratton to discover

that Wommack was involved in inducing the Garzas to breach. Stratton contended that he could not

have known Wommack was involved until August 2003, when he saw the 2003 Austin newspaper

article. Not until then, Stratton alleges, did he learn that Wommack was managing the Boys.

Stratton does not identify any actions that he took after March 2000 (when he expressed his

suspicion or "concern" that a third party had wrongfully induced the Garzas to breach) to investigate

who might have persuaded the Garzas to breach.

---

[9]*Accord Lebron-Rios v. U.S. Marshals Service*, 341 F.3d 7, 12 n.6 (1st Cir. 2003) ("Whether the limitations period had expired . . . is not for us to decide. [T]he question . . . is a matter for the responsible agency in the first instance, and for the district court in the next."); *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 723 (10th Cir. 1986) (remanding for district court to determine which limitations period covered claim); *Villanueva v. United States*, 346 F.3d 55, 63 (2d Cir. 2003) ("[W]e decline to consider in the first instance Tran's argument that AEDPA's limitations period should have been equitably tolled . . . as Tran did not raise this argument before the district court . . . ."); *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 42 (1st Cir. 2003) ("The limitations defense . . . should be addressed in the first instance by the district court."); *Hoffman v. United States*, 17 F. App'x 980, 990 (Fed. Cir. 2001) ("While the foregoing suggests merit to the government's statute of limitations argument, we believe that, in the first instance, the issue should be addressed by the district court . . . ."); *United States v. Twenty-Seven Parcels of Real Property*, 236 F.3d 438, 440 (8th Cir. 2001) (statute of limitations on civil forfeiture began to run when government discovered owner's drug activities, and the court remanded for the district court to determine date of discovery in the first instance).

Wommack is no more helpful to the court on this issue. He offers *no* evidence or argument as to when Stratton should have known that *Wommack* was involved in inducing the breach. Oddly, Wommack's appellate brief, like his briefs below, seems more tailored to a statute of limitations defense on behalf of record producers Tullio and Fabroni, who are not parties here:

> Stratton admits that in 1999, he knew about the Garzas' conduct that he now claims constituted a breach of contract. He therefore had knowledge of the alleged breach more than three years before he filed his complaint. Stratton admitted in a letter written by his attorney on March 16, 2000, that he was concerned that third parties were influencing the Garzas to end their relationship with him. He admitted in his deposition that the third parties . . . were Jim Tullio and Rob Fabroni and that he was convinced that they influenced the Garzas to end their relationship with him. Stratton's attorney wrote the letter more than three years before Stratton filed his complaint.
>
> It is clear from Stratton's own admissions that he knew of his cause of action for inducing the breach of a contract no later than March 16, 2000. * * *
>
> * * *
>
> *No later than March 16, 2000, Jimmy Stratton believed* that the Garzas had breached the purported management agreements with him and *that by criticizing his management in the presence of the Garzas and engaging in other conversations with the Garzas, Mr. Tullio and Mr. Fabroni may have been at the root of the Los Lonely Boys' desire to walk away from him.* For whatever reason, Stratton did not further investigate any role Tullio and Fabroni may have played in the decision of the Garzas to end their relationship with him. He did not file suit against them for inducing the Garzas to breach the purported management agreements with him. Mr. Stratton chose instead to file suit for inducing the breach of those purported contracts against Kevin Wommack, after waiting more than three years from the time of his initial knowledge of his injury. * * *

Wommack Br. at 11-13 (emphasis added); *see also id.* at 18-19 ("It is also undisputed that Stratton concluded prior to March 16, 2000, that third parties (*whom he identified at deposition as Tullio and Fabroni*) . . . may have been at the root of Los Lonely Boys' desire to walk away from him. It is also

undisputed that at a meeting sometime between April and November of 1999, Stratton witnessed *Mr. Tullio and Mr. Fabroni* criticizing his management in the presence of the Garzas.") (emphasis added); Wommack Br. at 25 ("[Stratton] acknowledged in his deposition that he was convinced that what *Tullio and Fabroni* told the Garzas caused them to walk away from his contract.").

Thus, the district court did not require Wommack to brief or argue the relevant questions for purposes of the limitations period, and Wommack failed to address them. First, Wommack should specify what Stratton should have done to find out whether there was reason to suspect that *he* induced the Garzas to breach. *See Hathaway v. Middle Tenn. Anesthesiology, P.C.*, 724 S.W.2d 355, 360 (Tenn. Ct. App. 1986) (trial court granted summary judgment for defense on wrongful-death claim on ground that it was time-barred, and appeals court reversed) ("[W]hether due diligence . . . required an examination of public records or any other particular form of investigation is properly a question for the trier of fact after hearing all of the evidence, rather than a question of law to be determined by summary judgment based upon the limited evidence in this record.").

The next question will be, if Stratton had diligently investigated the cause of the Garzas' breach, when should he have discovered Wommack's alleged role in inducing the breach? Was there evidence available to Stratton, before the August 2003 Austin newspaper article, that should have suggested *Wommack* had a role in inducing the breach, such as articles in readily available newspapers, industry publications, or websites? *See generally Maestas v. Sofamor Danek Group, Inc.*, No. 02A01-9804-CV-00099, 1999 WL 74212, at *3 (Tenn. Ct. App. Feb. 16, 1999) ("The

discovery rule will not protect claimants who ignore readily available information and do not investigate what they know or have reason to suspect.").

Wommack does proffer one piece of evidence that arguably shows Stratton had reason to suspect Wommack of tortious interference before the August 2003 Austin newspaper article. Specifically, Wommack points to Stratton's April 2002 deposition of the Boys' father in a related Tennessee chancery court action ("the April 2002 deposition"). Mr. Garza testified that, although the Boys had no "manager" since the 1999 fallout with Stratton, they had paid Wommack commissions to do their "booking" since sometime in 2000. Assuming arguendo that that testimony gave Stratton reason to suspect that Wommack induced the Garzas' breach of his agreement, the testimony occurred in April 2002. Stratton filed this action in October 2002, about six months after Mr. Garza's deposition. Thus, if the April 2002 deposition is the earliest event in the record that could trigger § 28-3-105, Stratton's action was well within the three-year period.

Otherwise, Wommack does not explain what Stratton should have done to investigate who induced the breach. Nor does Wommack point to any reasonably available evidence that should have led Stratton to suspect *him* of tortious interference before the April 2002 deposition. *Cf. House v. Edmondson*, No. W2005-00092-COA-R3-CV, – S.W.3d –, 2006 WL 1328810, at *18 (Tenn. Ct. App. May 16, 2006) (holding there was a genuine issue as to whether claim was time-barred, and stating, "[Defendant] offered no evidence in support of his motion for summary judgment tending to prov[e] [plaintiff]'s lack of diligence."), *app. denied* (Tenn. Nov. 6, 2006); *Am. Fid. Fire Ins. Co. v. Tucker*, 671 S.W.2d 837, 841 (Tenn. Ct. App. 1983) ("Since the complaints do not show on their

−17−

face that they are barred by the statute of limitation, it is obvious that some extrinsic proof is necessary to establish the bar of the statute. Since there was no such proof, we reverse the judgment of the trial court dismissing the actions, and remand the case for further proceedings . . . .").

This sparse record reinforces the need for the district court to develop the relevant factual allegations and decide the discovery/accrual issue in the first instance. *See United States v. Rodriguez Aguirre*, 264 F.3d 1195, 1214-15 (10th Cir. 2001).

VII.

For these reasons, we vacate the order granting summary judgment to Wommack and remand for further proceedings consistent with this opinion.[10]

---

[10]Stratton asserted two grounds for reconsideration. We need not consider these grounds for reconsideration, because it was error to grant summary judgment to Wommack in the first place.

Case No. 06-5634
*Stratton v. Wommack*

**SUHRHEINRICH, J., dissenting:** Because I believe Plaintiff Jimmy Stratton reasonably could have discovered that he had a cause of action as of September 21, 1999, I would hold that this suit is barred by Tenn. Code Ann. § 28-3-105 (2006). I therefore dissent.

As the majority notes, the Tennessee Supreme Court has adhered to the following discovery rule in tort actions for over thirty years: "[T]he cause of action accrues and the statute of limitations commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *McCrosky v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1971) (footnotes omitted). Under the discovery rule, "mere ignorance and failure of a plaintiff to discover" his cause of action is not sufficient to toll the running of the statute of limitations. *Hall v. DeSaussure*, 297 S.W2d. 81 (Tenn. Ct. App. 1956); 21 Tenn. D. 2d *Limitation of Actions* § 959a) (1987); 54 C.J.S. *Limitations* § 116 (2006). An exception may apply where the plaintiff's failure to discover his cause of action results from the defendant's fraudulent concealment of the cause of action.

In reaching its decision, the majority relies on the two-part test from the Tennessee Supreme Court's opinion in *Foster v. Harris*, 633 S.W.2d 304 (Tenn. 1982). In doing so, the majority has applied the exception rather than rule, even though Stratton neither pled nor offered evidence of fraudulent concealment.

*Foster* involved "unique questions" not at issue in this case, and its holding must be limited to its facts. *See id.* at 304. In *Foster*, the plaintiff first learned of his *illness* in early January 1976, after extensive testing revealed that he had serum hepatitis. *Id.* at 304. At that point, "the plaintiff

–19–

and his physicians conducted a diligent search" in an effort to discover the source of the *illness*. *Id.* The plaintiff did not learn that he had contracted it as a result of a negligent act, by a tortfeasor–therefore making it an injury–until July 1976, however, when the tortfeasor dentist informed him that he had the disease. *Id.* at 305 ("In this case, neither the *injury* nor the tort feasor who perpetrated the *injury* were discovered until July 21, 1976." (Emphasis added.). Thus, in *Foster*, the tortfeasor's fraudulent concealment prevented the plaintiff from knowing not only the existence or identity of the tortfeasor, but fact of the *injury* itself, despite knowledge of the *illness*. Further, once the *Foster* plaintiff became simultaneously aware of both the injury and the tortfeasor, he filed suit within seven months. Thus, the *Foster* test–that "no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty"– must be interpreted in the context of the *Foster* facts and not treated as a broad transformation of the discovery rule as stated in *McCrosky*.

By contrast, in this case, Stratton knew, or in the exercise of reasonable care, should have known, of his injury as early as September 21, 1999. By then, Los Lonely Boys had taken numerous actions evincing their intent to work with persons other than Stratton. As the majority opinion reflects, in late 1999, Los Lonely Boys failed to show for several appearances and conferences scheduled by Stratton, and failed to pay him any commissions when they did perform. They failed to record music, as Stratton had arranged, and failed to perform at a BMI Showcase in Nashville on January 6, 2000, as Stratton had arranged. Any lingering doubt was dispelled in March 2000, when

Garza's counsel informed Stratton that they were terminating their agreement with him. And, by this time, by his own admission, Stratton was "further concerned that there are third parties that may have gained the collective ear of the band and may be at the root of Los Lonely Boys' desire to walk away [from him]."

In other words, unlike the plaintiff in *Foster*, Stratton had full knowledge that a wrong had occurred and that he was injured, and that third-party interference likely played a role by September 1999. Thus, at that point in time, even if he did not know who the tortfeasor was, Stratton was obligated to exercise reasonable diligence in trying to find out. Stratton, as a band manager, had experience in the record industry, and could no doubt have discovered what role, if any, Womack was playing in the Los Lonely Boys' professional career. Stratton could also have made a formal inquiry during the discovery phase of the state court proceedings. For instance, Stratton could have sent the Los Lonely Boys an interrogatory requesting the names of all persons that Los Lonely Boys have paid commissions to for booking their gigs after 1999. Instead, he did nothing until he stumbled across the *Austin American Statesman* article in August 2003. But Stratton's serendipitous find is not the measure of the appropriate accrual date; rather the test is when the plaintiff discovered the injury, or reasonably could have discovered that he had a cause of action.

Thus, although an accrual date is frequently a question of fact, here the evidence is neither conflicting nor subject to different inferences. *See Prescott v. Adams*, 627 S.W.2d 134, 139 (Tenn. Ct. App. 1981). There is no factual dispute about the level of inquiry Stratton exercised–he did not conduct any until 2003. Thus, summary judgment on the issue was appropriate.

For these reasons, I would AFFIRM the judgment of the district court.