**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0467n.06**
**Filed: June 29, 2007**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**No. 06-3663**

| | | |
|---|---|---|
| JAMES COBURN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ROCKWELL AUTOMATION, INC., | ) | COURT FOR THE NORTHERN |
| and ROCKWELL SOFTWARE, INC., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

BEFORE: MERRITT and GRIFFIN, Circuit Judges; and LAWSON, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff-appellant James Coburn began working as a software engineer for defendants-appellees Rockwell Automation, Inc., and Rockwell Software, Inc. (collectively "Rockwell") in 1979. In 2003, Rockwell laid off Coburn and six other employees as part of a reduction in force ("RIF"). In 2004, Coburn sued Rockwell in Ohio state court, asserting a claim for age discrimination pursuant to OHIO REV. CODE §§ 4112.02 and 4112.99; Rockwell removed the case to the United States District Court for the Northern District of Ohio ("the district court") pursuant to 28 U.S.C. § 1441, and, in 2006, the district court granted summary judgment to Rockwell.

_____

[*]The Honorable David Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

- 1 -

The district court determined that Coburn had made out a prima facie case of age discrimination but failed to show a genuine issue as to whether Rockwell's stated reasons for his inclusion in the RIF (the need to reduce the budget, and the determination that his functions could be eliminated or assumed by other employees with the least harm to the business) were a pretext for age discrimination. The district court granted summary judgment to Rockwell, and Coburn timely appealed. For the reasons that follow, we reverse.

I.

From 1979 until his layoff in 2003, Coburn worked as a software engineer for Rockwell and its predecessor; at all times, he was an at-will employee. At the time of his layoff, Coburn was Director of Application Programs. Coburn reported directly to Tim Reckinger, with a "dotted line" report – whatever that is – to Steve Zink. Rockwell Automation created its subsidiary Rockwell Software in 1994, and Coburn transferred to the subsidiary in 1998.

For the three years prior to Coburn's layoff in 2003, he worked on a product called the Control Planner Simulator ("CPS"), which simulates the operation of a control system on a computer. Coburn also worked as product manager for the Virtual PLC project ("VPLC"), which had been jointly developed by Rockwell and Ford Motor Company ("Ford"). Coburn worked on a third Rockwell product called RS TestStand, which was similar to the CPS. In addition to helping to write the specifications for RS TestStand, Coburn was in charge of planning and marketing the project in the general marketplace, and he was the primary contact with Ford and RS TestStand's other customers. Coburn met his performance goals every year that he worked for Rockwell.

In late 2001, Rockwell Software President Rich Ryan told Coburn that business conditions warranted the termination of the VPLC project with Ford. Ryan, supervisor Reckinger, and Coburn met with Coburn's Ford counterpart to discuss the issue.

Rockwell alleges that the shutdown of the VPLC project would have resulted in the termination of the jobs of Coburn and his subordinates, all of whom were younger than him, but ultimately it did not terminate the project.

In fiscal year ("FY") 2001 and 2002, Rockwell Software did not meet its projected revenue and earnings targets, and, in August 2003, it identified a gap of $1.7 million between projected costs and earnings for FY 2004, which started on October 1, 2003.

Ryan convened meetings with Larry Brown, Ralph Lalone, Brandon Ekberg, John Baier, and Ralph Kappelhoff to discuss ways to make up the shortfall for FY 2004. They discussed eliminating or delaying incentive and bonus payments, requiring high-level employees to take a week without pay, and spreading out software development costs over the life of the product to reduce up-front expenses. Ryan and the team determined that these actions would reduce the FY 2004 gap only by $1.2 million, leaving $500,000 in anticipated shortfall.

President Ryan and the team determined that about seven people would be RIF'd (i.e., laid off as part of the reduction in force). Rockwell claims that it chose whom to RIF based on how the elimination of their positions would affect business continuity, skill sets, and cash flow. Rockwell claims that it began by analyzing which product lines were or were not generating cash, with an eye towards protecting the lines that were generating the most cash. According to GM Kappelhoff, the

team's second step was to consider the product lines that were not performing well, noting that in some cases the company had two people with the same job.

GM Kappelhoff asked the team to determine how reducing investment in the VPLC project would risk Rockwell's minimum commitment to Ford, its partner in the project. The team informed Kappelhoff that Rockwell could not simply reduce its investment in VPLC to zero because the VPLC product was not yet functionally complete. The team then considered whether Rockwell could meet its commitment to Ford by just continuing the development of VPLC without doing much marketing; Reckinger concluded Rockwell could do so.

It is undisputed that Coburn's main duties were in marketing the VPLC project. The record suggests that his responsibilities in terms of product development were largely supervisory; most of the actual work was done by his subordinates. Ryan states that the team concluded that others could assume Coburn's supervisory duties in non-VPLC areas.

President Ryan and the cost-cutting team identified seven individuals to RIF: Coburn (who was 55 at the time of the RIF), David Kebbekus (47), Jeffrey Hamilton (46), Collins Gittings (45), David Lillie (43), Sam Main (43), and Daniel Woodward (34). Rockwell laid off Coburn on September 29, 2003, two days before the start of FY 2004. Rockwell paid Coburn $54,000 in severance, including a bonus and five months salary.

The remaining development, relationship management, and other functions of Coburn's position were absorbed by Reckinger (42 at the time of the RIF), Zink (45), Felicia Moore (44), Sudhi Bangalore (39), and Myron Shawala (33).

After Rockwell laid Coburn off, he applied in November 2003 for two positions at Rockwell: Software Manager and Program Manager-Automotive Solutions. Mary McDonald, the hiring manager for the Software Manager position, conducted telephone screening of applicants for that position; she chose not to call Coburn for two reasons. First, McDonald found Coburn's qualifications to be inadequate because he lacked the necessary front-line sales experience, which she defined as "[a]ctually being assigned to a sales office that daily communicates with field salespeople as well as customers." Second, McDonald did not consider Coburn suitable because of her prior experience working with him. McDonald hired a 32-year-old external applicant named Michael Campbell.

Wiley Wolfe, the hiring manager for the Program Manager-Automotive Solutions position, compiled and posted a list of minimum qualifications and desired qualifications. Wolfe claims that he never became aware that Coburn had applied. Wolfe hired 43-year-old applicant John Diurba. Coburn concedes that Diurba was qualified, but alleges that Wolfe chose Diurba rather than him because of age discrimination.

According to Rockwell, its hiring process begins with its hiring manager providing a list of minimum qualifications and preferred qualifications to a recruiter, who then screens applications received online. The recruiter identifies applicants who best match the posted qualifications and forwards those applications to the hiring manager. The hiring manager consults with the recruiter and selects a group of applicants for the recruiter to "screen" via telephone. Some of the applicants who undergo the telephonic interview are invited for an in-person interview.

II.

Case No. 06-3663
*Coburn v. Rockwell Automation*

In March 2004, Coburn filed a complaint in the Cuyahoga County, Ohio Court of Common Pleas, alleging that Rockwell laid him off because of his age and refused to rehire him because of his age in violation of OHIO REV. CODE §§ 4112.02 and 4112.99. In April 2004, Rockwell timely removed the case to federal court on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1441. In April 2006, the district court granted summary judgment to Rockwell, and Coburn timely appealed to this court.

III.

We review the district court's entry of summary judgment de novo. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005).

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 515 (6th Cir. 2006) (citing FED. R. CIV. P. 56(c)). We must construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences therefrom in its favor. *Id*. The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.*

IV.

In evaluating state-law discrimination claims, the Ohio courts look to analogous federal antidiscrimination statutes and federal decisions interpreting them. *Plumbers & Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

Under Ohio law, a plaintiff may prove discrimination directly or indirectly. *Smith v. E.G. Baldwin & Assocs., Inc.*, 695 N.E.2d 349, 351-52 (Ohio Ct. App. 10th Dist. 1997). "Direct evidence

is evidence that proves the existence of a fact without requiring any inferences." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (citation and internal quotation marks omitted).

In this context, direct evidence is evidence of any nature, which, if believed, is sufficient by itself to show "the employer more likely than not was motivated by discriminatory animus." *Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1279 (Ohio 1996). Or, as we have explained:

> Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.

*Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800 (6th Cir. 2007) (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003)).

"Once the plaintiff establishes such direct evidence, the burden shifts to the defendant to demonstrate by a preponderance of the evidence that it would have reached the same decision absent any discrimination." *Carter v. Russo Realtors*, No. 00AP-797, 2001 WL 537019, at *2 (Ohio Ct. App. 10th Dist. May 22, 2001). "[A]s the [United States Supreme Court] stated in *Trans World Airlines, Inc. v. Thurston* [469 U.S. 111, 121] (1985) . . . the *McDonnell-Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Mauzy*, 664 N.E.2d at 1276. In this context, "direct evidence" refers to the method of proof, not the type of evidence. *Id*. at 1277. Absent direct evidence of age-discriminatory intent, the *McDonnell-Douglas* burden-shifting analysis applies.

The district court held that Coburn had not presented direct evidence of age discrimination; we disagree. Coburn alleges that his supervisor, Reckinger, conveyed a management official's age-biased statement to him while escorting him off the premises after his termination:

> He was very upset at having to let me go, and during that conversation indicated that this was not either his or Steve [Zink]'s decision, that this decision was made by [Engineering Director] Brandon Ekberg and that he quoted Brandon as saying that Brandon was tired of letting young talented engineers go and he was going to go after the group of us.

Because Coburn is opposing summary judgment, we must accept his factual evidence as true. Therefore, we assume Reckinger made the statement which Coburn attributes to him.

As the Ohio Court of Appeals has explained, "[d]irect evidence is found . . . *where a statement by an employer directly shows there is a discriminatory motive.*" *Olive v. Columbia/HCA Healthcare Corp.*, Nos. 75249 & 76349, 2000 WL 263261, at *2 (Ohio Ct. App. 8th Dist. Mar. 9, 2000) (emphasis added) (citation omitted). The parties disagree over whether Reckinger's statement constitutes a "statement by the employer" for this purpose. We hold that it does.

Under Ohio law, "age related comments directed toward the employee may support an inference of age discrimination, [but] isolated, ambiguous, or abstract comments cannot . . . ." *Hoyt v. Nationwide Mut. Ins. Co.*, No. 04AP-941, 2005 WL 3220192, at *14 (Ohio Ct. App. 10th Dist. Dec. 1, 2005) (citing *Robinson v. Nationwide Mut. Ins. Co.*, No. 2000-L-119, 2001 WL 1647144 (Ohio Ct. App. 11th Dist. Dec. 21, 2001)). We conclude that neither Reckinger's comment, nor the Ekberg comment he conveyed, was isolated, ambiguous, or abstract.

Ekberg's testimony shows that he was one of a fairly small team that either decided, or substantially helped Ryan decide, whom to include in the RIF. According to Ekberg, the team

included Ryan, Ekberg, and only four others: Architecture Director John Baier, HR Director Ralph Lalone, GM Ralph Kappelhoff, and Larry Brown. Ekberg's testimony suggests that he and Ryan were involved in all the meetings and phone conversations about whom to RIF, but the other four individuals may not have been involved in all of them. One could infer that Ekberg played a major role either in choosing Coburn for the RIF or in advising Ryan to do so.

Moreover, we need not rely on inference. Rockwell's appellate brief contains the following admission: "Rockwell has consistently conceded that *all* members of Ryan's team – Ryan, Brown, Lalone, Kappelhoff, and Ekberg – are equally responsible for the decision, and equally chargeable as decisionmakers for purposes of this lawsuit." In short, Rockwell concedes that Ekberg was as responsible for the decision to include Coburn in the RIF as anyone else, and Ekberg's testimony could support the inference that he played a larger role than anyone but president Ryan himself. Accordingly, Rockwell cannot deny the relevance of Ekberg's statement to Reckinger that he was "tired of letting *young* talented engineers go" and intended to "go after the group of" older employees.

First, Ekberg's comments are unequivocally unfavorable towards older engineers: he was "tired of letting young engineers go" and wanted to "go after" the group of older engineers instead.

Second, the context of the Reckinger and Ekberg statements makes it disingenuous to claim that either was "abstract." When Ekberg expressed his frustration to Reckinger at letting young engineers go, it was precisely in the context of discussions about *which employees should be let go* – and let go very soon, at that. Ekberg's comments were far from an abstract expression of prejudice against older employees with no real-world implications.

Third, Ekberg's statements related to the retention of younger employees and, necessarily, the termination of older employees, not to more general budgetary or performance concerns, so it was not *conceptually* remote from the termination of 55-year-old Coburn.

Fourth, Ekberg's statements were not *temporally* remote from Coburn's termination.

Likewise, when and where did Reckinger tell Coburn that Ekberg was "going to go after the group of [you]"? Shortly after Coburn learned of his termination, *during* a conversation about why Rockwell chose to RIF Coburn, and *immediately after* relating Ekberg's stated desire not to get rid of *young* engineers. In that context, there was no reasonable ambiguity about who "the group" was: the employees who had just been RIF'd. Rockwell cannot evade the fact that Ekberg's alleged statements were made with reference to the impending RIF that claimed Coburn's job.

Having determined that Ekberg's alleged comments were neither abstract nor ambiguous, we also conclude that they were not isolated. Coburn testified at deposition that Ryan stated on several occasions that a software company like Rockwell Software should look "young and aggressive." As Rockwell points out, however, when Coburn was pressed on the matter, he could *specifically* recall only one such instance, a staff meeting in 1999.

Coburn also introduced an affidavit from former Human Resources Director John Beatty, recounting Ryan's remark that he did not want to employ "old, tired" programmers. Significantly, Beatty stated that Ryan had told Personnel not to recruit "older workers from machine tool shops" but to focus on "younger employees coming from newer markets" because "younger employees had better ideas" and were "more current with the changing needs of the marketplace." Beatty further stated that Ryan often said Rockwell Software needed to find ways to keep younger employees from

leaving, and that Ryan had changed the structure of Rockwell Software's benefit plans to make them more appealing to younger workers.

Rockwell contends that Beatty's testimony is not relevant because Beatty left Rockwell in 1996, years before the RIF. But that goes to the weight of Beatty's testimony, not its relevance. A reasonable jury that believed Beatty could find that at the time of Ryan's comments to Beatty, Ryan was biased against older employees and willing to implement that bias in hiring decisions. Rockwell does not explain why the jury could not also believe that Ryan did not materially change in this regard between the time Beatty left and the time of the RIF. Ryan's alleged later comment about the need to look "young and aggressive" could suggest just that – that Ryan continued to harbor and intended to act on age bias well after Beatty left. A jury will be free to discount Ryan's arguably age-biased comments to Beatty as too temporally remote from the RIF to prove age bias in the much later RIF, but it is the job of Rockwell's counsel to convince the jury to do so.

Even if we put aside Ryan's comments to Beatty as too remote in time from the RIF, Coburn's testimony about Ryan's somewhat more recent "young and aggressive" comment suffices to show that Ekberg's alleged age-biased comments were not "isolated."

In order to constitute direct evidence of discrimination, however, it is not enough that a statement not be isolated, ambiguous, or abstract; it must also be the statement "of the employer." The Ohio courts interpret this to mean that the statement must be a statement by a decisionmaker. "There is a vital difference between comments which demonstrate a discriminatory animus in the decisional process and stray remarks made by nondecisionmakers." *Molnar v. Klammer*, No. 2004-L-072-CA, 2005 WL 3528870, at *4 ¶ 20 (Ohio Ct. App. 11th Dist. Dec. 23, 2005) (internal

quotation marks omitted), *app. not allowed*, 847 N.E.2d 6 (Ohio 2006). *See also Wohler v. Toledo Stamping & Mfg. Co.*, No. 96-4187, 125 F.3d 856, 1997 WL 603422, at *3 (6th Cir. Sept. 30, 1997) (table) (distinguishing a "comment made as part of a conversation specifically addressing the decisional process" from "stray remarks unrelated to the decisional process").

As the district court correctly found, "there are factual issues [as to] whether Ekberg and Reckinger were involved in the decision to terminate [Coburn's] employment." On the record developed thus far, a reasonable jury could find that Ekberg was directly and extensively involved in the decision to include Coburn in the RIF. By Ekberg's admission, he was not just a supervisor or manager; he and Ryan conferred about the RIF roster on ten to twelve occasions, sometimes without one or the other member of the RIF team present. In other words, he and Ryan were the constants in management's RIF deliberations.

Finally, the precise wording of Ekberg's alleged comments supports Coburn's characterization of the comments as direct evidence. Here, Ekberg did not stop at merely expressing his general preference for younger engineers ("tired of letting young talented engineers go"). He went on to tell Reckinger that he was going to "go after the group of [them]," i.e., the group of older engineers who were indeed RIF'd. That second comment obviates the need for the jury to make inferences, rendering Ekberg's comments direct rather than indirect evidence.

In short, engineering director and RIF advisor Ekberg's alleged comments about being tired of letting go of young employees and intending to "go after" older employees were not isolated, ambiguous, or abstract, and they could reasonably be considered statements "by the employer." Accordingly, Ekberg's alleged comments constitute direct evidence of age discrimination under Ohio

law.  If Ekberg actually made the statements allegedly reported by Reckinger, a jury could take those statements alone as proof of "the existence of a fact [discriminatory motive] without requiring any inferences."  *Rowan*, 360 F.3d at 548.

In turn, Coburn's direct evidence makes out a prima facie case that age discrimination was a motivating factor in Rockwell's decision to include him in the RIF.  This obviates the need to conduct the *McDonnell-Douglas* burden-shifting analysis, which is "inapplicable where the plaintiff presents direct evidence of discrimination.'"  *Mauzy*, 664 N.E.2d at 1276.

Because Coburn's direct evidence establishes a prima facie case, the burden shifts to Rockwell to articulate a lawful reason for including Coburn in the RIF.  *Barker v. Scoville, Inc., Schrader Bellows Div.*, 451 N.E.2d 807, 809 (Ohio 1983).  Rockwell carries that burden by producing uncontested evidence that the company faced a severe shortfall for FY 2004.  Consequently, "while an inference of discrimination may still be drawn from the plaintiff's prima facie evidence, the mandatory presumption of discrimination drops from the case." *Stockman*, 480 F.3d at 802 (citation omitted).

To survive summary judgment, then, Coburn must then establish that the reasons Rockwell offered for his inclusion in the RIF were not its true reasons, but a pretext for age discrimination. *Barker*, 451 N.E.2d at 809.  Coburn must show both that Rockwell's stated reason was false and that age discrimination was the real reason for his termination.  *Chandler v. Dunn Hardware, Inc.*, 860 N.E.2d 1042, 1045 (Ohio Ct. App. 8th Dist. 2006) (citing *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

On this record, Coburn has shown a genuine issue of material fact regarding whether Rockwell's stated reasons for including him in the RIF were pretexts for age discrimination.

The evidence that established Coburn's prima facie case (Ekberg's comments during the RIF deliberations) also serves him well on the issue of pretext. *See generally Carney v. Cleveland Hts.-Univ. Hts. City Sch. Dist.*, 758 N.E.2d 234, 245 (Ohio Ct. App. 8th Dist. 2001) (the factfinder, "in determining whether the employer's explanation is a pretext, may 'still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Ekberg's alleged comments are probative and potentially powerful evidence that age was a motivating factor in Coburn's selection for the RIF. In fact, Ekberg's comments alone might enable Coburn to survive summary judgment under Ohio law. For example, in *Grooms v. Supporting Council of Preventative Effort*, 809 N.E.2d 42 (Ohio Ct. App. 2d Dist. 2004), Eldridge and Florence were responsible for filling a vacant inspector's position. *Id.* at 45. Grooms, a white man, sued for racial discrimination when he was not chosen for promotion to that position. Grooms alleged that Eldridge told him that *her* supervisor, Joyce Price, said she "preferred to promote blacks because they had been done wrong for so many years." *Id.* The Ohio Court of Appeals held that the employer was not entitled to summary judgment on the racial discrimination claim, stating:

> Although Price's statement about preferring to promote blacks over whites is not direct evidence of discrimination in Grooms's case, it certainly supports an inference that [the employer] discriminates against [whites] in favor of [blacks]. Additionally, the record reflects that Price made the remark to Eldridge, who then repeated the policy when explaining why Grooms was not promoted. As a result, a trier of fact reasonably might infer that Eldridge had adopted Price's discriminatory preference. * * * Although the trial court characterized Grooms's testimony as "unsubstantiated," it must be accepted as true in the context of summary judgment.

As a result, we find background circumstances from which a trier of fact could conclude that [the employer] discriminates against [whites].

*Id*. at 50.

In any event, Coburn does present other, indirect evidence of age discrimination. This additional indirect evidence, taken together with Ekberg's comments, shows that there is a genuine issue of material fact whether Coburn's inclusion in the RIF was a pretext for illegal age discrimination.[1]

Rockwell must show why it included Coburn in the RIF instead of others. *Tye v. Bd. of Educ. of Polaris Jt. Voc. Sch. Dist.*, 811 F.2d 315, 319 (6th Cir. 1987).

Coburn must show, by a preponderance of the evidence, that Rockwell's proffered reasons for including him in the RIF either (1) had no basis in fact, (2) did not actually motivate his inclusion in the RIF, or (3) were insufficient to motivate his inclusion in the RIF. *Hollingsworth v. Time Warner Cable*, 861 N.E.2d 580, 590 ¶ 27 (Ohio Ct. App. 1st Dist. 2006), *app. not allowed*, 861 N.E.2d 145 (Ohio 2007); *Payton v. Receivables Outsourcing, Inc.*, 840 N.E.2d 236, 246 ¶ 34 (Ohio App. 8th Dist. 2005) (citations omitted), *app. not allowed*, 852 N.E.2d 1054 (Ohio 2006). *Accord Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 728 (6th Cir. 2007) (citation omitted).

Coburn does not attempt to show that Rockwell's stated reasons, if true, would not be sufficient to motivate his inclusion in the RIF (the third avenue for showing pretext). Instead, he

---

[1]Coburn contends that Rockwell did not really conduct a reduction in force because it hired many new employees shortly after his termination. Because we hold on other independent grounds that Coburn survives summary judgment, we need not consider this argument.

attempts to establish pretext through the first two avenues, arguing that Rockwell's stated reasons for RIF'g him had no basis in fact and did not actually motivate his inclusion in the RIF.

In support of his argument that Rockwell's stated reasons were not the true motivation for including him in the RIF, Coburn emphasizes that Rockwell has given inconsistent answers as to who decided to place him on the ten-person RIF candidate list. Rockwell's FED. R. CIV. P. 30(b)(6) representative, Lalone, testified that it was Ekberg, and only Ekberg, who identified Coburn:

Q.    Who identified those ten people?
A.    They were identified withinside [sic] of the subgroup.
Q.    So those ten people were identified by Ralph Kappelhoff and Brandon Ekberg, Larry Brown and yourself?

* * *

A.    Those names were the product of discussions that the four of us had.

Q.    How many of the ten people on that list did you identify?
A.    I don't believe I identified any.

Q.    Which ones did Brandon Ekberg identify?
A.    I recall him identifying Jim Coburn . . . .

Q.    Which ones did Larry Brown identify?
A.    I don't recall Larry identifying any.

Q.    And which ones do you recall Ralph Kappelhoff identifying?
A.    Collins Gettings, and there was discussion between Ralph [Kappelhoff] and Brandon [Ekberg] with regard to Jeff Hamilton . . . .

Ekberg, however, testified that Coburn was *not* one of the people whom he placed on the RIF candidates list:

Q.    What did you do after that meeting as a result of the action items that were sent?
A.    Evaluated my organization and determined potential places to cut.

> Q. Did you create a list of people who could be potentially cut from the organization?
> A. Yes.
>
> Q. Who did you send that list to?
> A. I do not remember exactly. I know I sent it to [president] Rich Ryan, Larry Brown and [HR director] Ralph Lalone.
>
> * * *
>
> Q. Who is on the list you sent to Ryan, Brown and Lalone?
> A. To the best of my recollection, it was Dan Woodward, Sam Main, Dave Lilly and there was an engineer in Vancouver whose name I can't remember.
>
> Q. So you sent a list of four people who you thought could be let go from your organization?
> A. Yes.

Ekberg also testified that he could not recall whether president Ryan recommended that Coburn be put on the RIF candidate list, and in fact could not recall at all who recommended that Coburn be RIF'd. For his part, HR Director Kappelhoff testified that he could not recall who first raised Coburn as a possible RIF candidate.

The contradiction between Lalone and Ekberg refutes Rockwell's assertion that "[a]t most, the record merely shows that Ryan's team could not remember who among them was first to mention Coburn." Lalone did remember that it was Ekberg who not only "first mentioned" Coburn but actually placed him on the RIF candidate list, and Ekberg flatly contradicts Lalone.

Rockwell asserts that "the identity of who among the team was the first to float Coburn's name is not a material fact, because it could not affect the outcome of the lawsuit." Yet even the district court acknowledged that the Rockwell officials' inability to agree on who recommended Coburn for the RIF is "puzzling," "problematic," and "presents some difficulty in determining the reason for Plaintiff's inclusion in the RIF."

A reasonable jury could infer that if Rockwell cannot even give a straight answer about who recommended Coburn for the RIF list, it is trying to hide something. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) ("The inconsistency of these statements by the different managers . . . creates two important questions of material fact: *who was actually responsible for the decision to fire Tinker*, and what was the reason that caused that decision maker to decide that Tinker should be fired? These inconsistencies demonstrate that there is a genuine issue of material fact regarding Sears's proffered reason for Tinker's termination.") (emphasis added).

We cannot assume that the jury would compartmentalize the resultant suspicion of Rockwell; in other words, we cannot assume that a juror would say, "well, Rockwell seems evasive when it comes to who recommended RIF'g Coburn, but that does not affect its credibility on other things, like *why* it RIF'd Coburn." The jury could conclude that Rockwell's inconsistency on this issue undermines its credibility *generally.* For this reason, we are not persuaded by Rockwell's assertion that its inconsistent explanations of who recommended Coburn's placement on the RIF list is not material because it "could not affect the outcome of the lawsuit."

Rockwell's inconsistency as to who recommended Coburn's placement on the RIF list is material in a second respect, independent of its possible effect on Rockwell's credibility with the jury. The identity of the person or persons who recommended Coburn's placement on the RIF candidate list – and then his actual selection for the RIF – is crucial. As discussed above, whether engineering director Ekberg was a decisionmaker determines the relevance, potential probative value, and status as direct evidence of his alleged age-biased comments. This is particularly important given that Ekberg's comments are Coburn's only direct evidence of age discrimination.

Further trying to show pretext, Coburn contends that Rockwell gave changing and false explanations for his inclusion in the RIF. Inconsistency in an employer's explanation of the reasons for an adverse action "raises an inference [of pretext] that must be drawn, at summary judgment, in favor of the nonmovant." *See Seay v. TVA*, 339 F.3d 454, 468 (6th Cir. 2003) (internal quotation omitted) (alteration in original).

Coburn points to Kappelhoff's testimony that he had supervisor Reckinger conduct "financial basis and risk estimates" to assess the impact of the layoffs generally, and the impact of laying off Coburn in particular. At deposition, Kappelhoff had this exchange with counsel:

Q.   Okay. Have you been involved in layoff decisions at Rockwell Software?

* * *

A.   It was in the time frame mid August to the end of September of 2003.

Q.   When you say you were involved in the process, what was your role?
A.   * * * I was in the role of general manager. I provided the financial basis and risk estimates for what this would do to our business.

* * *

Q.   Who did you provide the financial basis and external risk estimates to?
A.   Larry Brown, Brandon Ekberg, Rich Ryan, John Baier, Ralph Lalone, I believe, should know.

* * *

Q.   When you say you provided the financial basis, what do you mean by that?
A.   Review of the product line P&Ls to identify which product lines were generating cash versus using cash and then, you know, a somewhat qualitative estimate of what a reduction in effort on a particular product line would mean for our customers.

Q.   Did you say "qualitative" or "quantitative"?
A.   Qualitative and quantitative.

\* \* \*

Q.    Was an impact analysis done to determine the effect of Jim Coburn being let go?

\* \* \*

A.    There was, yeah, discussion of what the impact might be.

Q.    Who was the discussion among?
A.    Myself, Brandon Ekberg, Rich Ryan. I think it would have been the same six people. We would have discussed potential impact.

Q.    What was said about potential impact?
A.    That we needed to review the Ford contract and that his tasks would then need to be combined in with somebody else's.

Q.    Was anything else discussed about the potential impact of letting Jim Coburn go?

\* \* \*

A.    No.

Kappelhoff claimed he had *Reckinger* perform an assessment of the layoff's impact on customers, and that he and Reckinger discussed terminating RS TestStand completely and the impact that would have on Ford:

Q.    *Who did you turn to to do the impact analysis of letting Jim Coburn go?*
A.    Tim Reckinger.

Q.    \* \* \* Sometime in the first week or two of September you believe the possibility of terminating Jim Coburn's employment was discussed. What did you then do as far as Tim Reckinger goes and an impact analysis?
A.    In this case, I would have called Tim Reckinger and asked him what the impact would have been to reduce investment in the RS test stand product . . . and take me through what the risk would be in our relationship with Ford and what the minimum commitment level is that we had. Then I would have brought this analysis back to the team.

Q.    When you say "reducing investment," what do you mean by that?

A.    Reducing the number of people working on the product.

* * *

A.    You want to know what Tim Reckinger said to me during the discussion?
Q.    Yes.
A.    We discussed terminating the program completely, which would be reducing the cost to zero, and he indicated that would have created a significant legal problem with Ford. We discussed, can we reduce the investment in development to zero and just treat this as marketing of a functional product? He said that wouldn't fly either because the product wasn't functionally complete.

* * *

Q.    What did you and Tim Reckinger discuss about reducing investment by letting people go?
A.    What I just said. You drop your R&D costs to zero. You drop your marketing costs to zero. You drop your total investment to zero. Those are the three categories of investment.

Q.    When you refer to "R&D costs," you're talking about getting rid of a person who is doing R&D. Is that correct?
A.    Yes. Or all of the people working in R&D for that product.
Q.    Who are all of the people working on R&D for that product?

* * *

Q.    It's that small group you talked about with maybe two or three people, correct?

* * *

A.    Yes. It was a relatively small product line, so it was a relatively small team working on it.

(Emphasis added). By contrast, Reckinger testified that he never discussed terminating RS TestStand or Coburn in September 2003, nor did he discuss the impact that terminating RS TestStand might have on Ford as claimed by Kappelhoff. Rockwell's appellate brief likewise states,

"Reckinger's only involvement in the process was answering discrete questions from Kappelhoff concerning Rockwell's commitments to Ford and communicating the decision to Coburn . . . ."

Crediting Reckinger's testimony, a jury could readily find that Kappelhoff lied about having discussions and analysis with Reckinger about the impact of scaling back or ending RS TestStand (and terminating the small team for that program, which included Coburn). The jury could conclude that a major part of Rockwell's stated reason for terminating Coburn was false, i.e. its purported analysis, with Reckinger's help, that terminating the portion of RS TestStand that Coburn worked on would do the least harm to Rockwell's business (including its profitability and its continuing contractual relationship with Ford). This creates a genuine issue as to pretext, because under these "circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.

Coburn presents other evidence that arguably falls short of a direct, unambiguous contradiction between Rockwell officials but still could undermine Rockwell's credibility about the process it allegedly used in deciding to RIF Coburn. For example, Ekberg testified that he was aware of a financial assessment with regard to the savings from laying off Coburn or others, but he was not aware of any internal or external risk assessment of the sort that Kappelhoff claims were done. Coburn states, without contradiction from Rockwell, that "Rockwell never produced any of the alleged risk assessments in discovery," and the district court correctly called "the lack of documentary support for the findings of the RIF [team] . . . troubling . . . ." *Cf. Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1554 (10th Cir. 1989) (reversing JNOV in favor of employer on Free Speech retaliation claim, noting, "the reason given for his transfer (a human relations problem of

plaintiff's inability to get along with people) may have been pretextual, as evidenced [by] the total absence of documentation corroborating the alleged problem").

Rockwell responds that "[t]hese arguments are meritless, because Coburn produced no evidence that any such materials [i.e., written risk assessments] ever existed. Coburn cannot explain away his inability to create a dispute concerning Rockwell's reasons for . . . his inclusion in the RIF, by claiming that it might have been more convenient for him had Ryan's team reduced all of their discussions to writing." But Rockwell's response misses the point. A jury could find it unbelievable that Rockwell had risk assessments conducted as to Coburn's layoff yet never produced even a single short writing (even handwritten notes) in the process. As a district court recently reasoned in denying an employer's summary judgment motion on an Ohio age-discrimination claim:

> The Court may, for instance, consider Roadway's failure to come forward with a plausible explanation of why they chose to terminate certain employees rather than others as evidence of pretext. Roadway repeatedly argues that it carefully examined the job functions that were critical to the reorganized marketing and sales departments and sought to reconfigure job descriptions to best cover these functions. *However, the Court finds little evidence of this. For example*, Roadway submitted numerous slides from presentations that [project manager] Drazetic and [district sales manager] Ferguson gave regarding the reorganization. However, the slides show only general information regarding possible plans for restructuring the marketing department. * * * *It is difficult to understand how Roadway could have done a studied comparison of all of the employees['] qualifications and job functions with the required qualifications and functions corresponding to the new positions without having first developed [written] job descriptions for those positions.*

*Reminder v. Roadway Express, Inc.*, No. 5:04-CV-2581, 2005 WL 2860983, at *12 (N.D. Ohio Nov. 1, 2005) (emphasis added), *aff'd on other grounds*, 215 F. App'x 481 (6th Cir. 2007). Similarly, the factfinder here could conclude that the reason Rockwell did not produce any writings from the risk assessment process is that Rockwell never conducted the assessments it claimed.

The jury might not be able to draw such a negative inference from the lack of any risk assessment documents if Rockwell introduced evidence that it had a policy or practice of never reducing RIF- or layoff-related analyses to writing. But Rockwell has not done so. *Contrast Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 964 (6th Cir. 1989) ("The district court conceded that Edgecomb had no legal duty to reduce its [reorganization/RIF] plan to writing, but nevertheless found the absence of writing indicative of pretext. We disagree. Edgecomb presented expert testimony which demonstrated that reduction in force plans are not generally reduced to writing in order to reduce the risk of premature release of such potentially controversial management decisions. In light of this evidence, the absence of writing is fully consistent with Edgecomb's proffered business reason for plaintiff's termination.").

In support of his argument that Rockwell's stated reasons have no basis in fact, Coburn alleges that Rockwell reached its decision to select him for the RIF in contravention of its own policies. Specifically, he points to a document entitled Rockwell Automation Policy Number 800-02-06 Reduction in Force Severance Plan, Revision A, which reads, in pertinent part,

> 1.0 PURPOSE
> To define the Rockwell Automation Reduction in Force Severance Plan.
>
> 2.0 SCOPE
> This policy is applicable to U.S. based Rockwell Automation salaried employees, excluding Temporary Service Employees, Co-ops, and Interns.
>
> 3.0 POLICY
> 3.1  Policy Statements
>                                   * * *
> *Temporary Service Employees generally will be the first to be affected by a reduction in force.*

(Emphasis added). Lalone confirmed that at the time of the RIF, Rockwell Software employed fifteen temporary employees, yet it did not terminate any of them.

Because the RIF policy states that temporary employees will "generally" be the first layoffs, the policy cannot be construed as an absolute guarantee that non-temporary employees will not be laid off until all temporary employees have first been laid off. Nonetheless, in light of the policy's stated preference for the layoff of temporary rather than non-temporary employees, a jury could find it suspicious that Rockwell apparently never considered laying off temporary employees instead of Coburn and the five other, over-age-40 non-temporary employees who were RIF'd. Rockwell attempts to foreclose this inference by relying on HR director Lalone's statement that Rockwell typically identifies a "specific . . . group of employees doing like kinds of activities" and only from within such a group, "temporary or contract employees would be reduced first before Rockwell employees would be affected." Rockwell continues, "Coburn produced no evidence that there were any temporary or contract employees working on any of Coburn's programs at the time of the September 2003 RIF." (Interestingly, Rockwell does not actually state that *in fact* there were no temporary employees working on Coburn's projects, just that Coburn failed to prove otherwise.)

But Rockwell fails to explain why the jury would be obligated, as a matter of law, to believe Lalone's testimony on this score. The jury could wonder, "If Rockwell's policy really were to RIF temporary employees only when they worked on functions that were being eliminated or scaled back, why isn't that in the written RIF policy?" The jury could conclude that Lalone's explanation for Rockwell's failure to RIF any of the 15 temporary employees instead of 55-year-old Coburn was a

self-serving, *post hoc* falsehood. This boils down to a credibility determination, the very type of

determination that courts may not resolve on summary judgment.

Thus, Rockwell's arguable failure to follow its own written RIF policy can support the

inference that it was determined to layoff employees on the basis of age, rather than their status as

temporary or non-temporary. *See Skalka v. Fernald Enviro. Restoration Mgmt. Co.*, 178 F.3d 414,

422 (6th Cir. 1999) (jury did not have to accept as credible the employer's explanation of why it

deviated from its RIF procedure). *Accord Tyler v. Union Oil Co.*, 304 F.3d 379, 396-97 (5th Cir.

2002) ("An employer's conscious, unexplained departure from its usual policies and procedures

when conducting a RIF may in appropriate circumstances support an inference of age discrimination

if the plaintiff establishes some nexus between employment actions and the plaintiff's age.").[2]

In sum, Coburn establishes a prima facie case through direct evidence, and he shows a

genuine issue of material fact regarding whether Rockwell's stated reasons for including him in the

---

[2]Rockwell relies on *White v. Columbus Metro. Hsg. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) for a supposed rule that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." But *White* is of no avail to Rockwell. First, the quoted statement is mere dicta. *White* relied on other grounds for its conclusion that the employer's departure from its policies could not prove pretext:

> White's arguments that CMHA circumvented its own policies are unpersuasive, both because these departures from CMHA's policies are either minor – e.g., failure to complete a cover sheet – or are insufficiently established, e.g., the violation of the nepotism policy, the violation of the policy preferring internal, equally qualified candidates.

*Id.* We are, of course, not bound by prior panels' dicta. *Williams v. Anderson*, 460 F.3d 789, 811 (6th Cir. 2006). Moreover, *White* cited no Supreme Court or published Sixth Circuit decisions for the proposition, merely decisions from two sister circuits, which do not bind us. *United States v. Carpenter*, 360 F.3d 591, 600 (6th Cir. 2004) (en banc).

RIF were a pretext for unlawful age discrimination. A jury could reasonably conclude that Ryan and Ekberg et al. chose Coburn for the RIF at least, in part, to satisfy Ekberg's expressed desire to "go after" older employees and stop losing young ones, and Ryan's expressed belief that the company should look "young and aggressive" and not employ "old, tired programmers": six of the seven RIF'd employees were over forty years old, with Coburn the oldest at 55; Rockwell gave inconsistent and arguably evasive answers about who decided to place Coburn on the RIF list; supervisor Reckinger denies having discussions about the impact of ending the RS TestStand program (Coburn's main project) as claimed by Kappelhoff; and engineering director Ekberg did not know of any risk assessment of the sort Kappelhoff claimed was done.

Even it were a close call as to whether Coburn has shown pretext, in a close case where both sides have adduced weighty evidence and the court cannot decide as a matter of law whether the employer's proffered reason is legitimate or pretextual, the issue must be submitted to a jury. *Johnson v. Kroger Co.*, 319 F.3d 858, 869 (6th Cir. 2003). Accordingly, Rockwell is not entitled to summary judgment on Coburn's claim of age discrimination with regard to his termination.

V.

As discussed above, Rockwell's brief expressly states that Ekberg and the other RIF team members had an equal role in deciding whom to RIF, and Ekberg's deposition testimony shows that he had a major role, perhaps second only to president Ryan, in determining whom to RIF. For those reasons, we found that Ekberg was a decisionmaker as to Coburn's inclusion in the RIF, making his alleged age-biased statements direct evidence that age discrimination was a motivating factor in Coburn's inclusion in the RIF.

By contrast, Rockwell's brief does not state that Ekberg had any formal role in, or input into, Rockwell's post-RIF decisions not to hire Coburn into the Software Manager or Program Manager-Automotive Solutions positions. Consequently, Ekberg's alleged age-biased comments cannot serve as direct evidence that age discrimination motivated Rockwell's decision not to rehire Coburn after the RIF. Accordingly, Coburn must make out a prima facie case as to his non-rehirings through the *McDonnell-Douglas* burden-shifting framework.

But this does not mean that Ekberg's alleged age-biased comments are not evidence bearing on whether age discrimination may have motivated Rockwell's decisions not to re-hire Coburn. Ekberg's comments are potentially powerful *indirect* evidence as to the climate at Rockwell and therefore its motivation for not rehiring Coburn. *Cf. Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729-30 (11th Cir. 1999) ("statements by a decision-maker that are not direct evidence of discrimination may still be used as circumstantial evidence of a discriminatory motive") (citation omitted).

To prevail on a claim of age-discriminatory failure to hire, Coburn has to show that (1) he was a member of the statutorily protected group, in this case people over forty years old, (2) he was qualified for the position for which he applied, (3) he applied for the position, or the employer was otherwise already obligated to consider him for the position, and (4) the position went to a substantially younger person. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir. 1989).

Coburn was over 40 when he applied for the Software Manager position, so he satisfies the first and third elements of the prima facie case. Coburn also satisfies the fourth element, showing that the position went to a substantially younger person: Rockwell filled the Software Manager position with John Diurba, who was then 43, twelve years younger than Coburn.

Thus, the parties' dispute turns on whether Coburn was qualified for the Software Manager position, and whether his perceived lack of qualification was the real reason for his non-hiring. At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified. Coburn need only present credible evidence that he was minimally qualified in the relevant field. The inquiry should focus on criteria such as his education, experience in the relevant industry, and possession of the required general skills. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). Rockwell asserts:

> The undisputed facts show that [hiring official Mary] McDonald elected not to conduct a telephone interview of Coburn because she had personal familiarity of [sic] his qualifications and knew that they did not meet the criteria for the position [of software manager]. Specifically, McDonald knew that Coburn lacked the necessary front-line field experience, which McDonald defined as "actually being assigned to a sales office that daily communicates with field salespeople as well as customers."

But the testimony cited by Rockwell establishes that McDonald did not know, when she decided not to interview Coburn, whether or not he had such "front-line experience":

> Q. Why did you choose not to interview Jim Coburn for this position?
> A. His qualifications did not meet the criteria of the job description.
>
> Q. What was lacking in his qualifications?
> A. Number one was that he had had no previous front-line field experience.
>
> * * *
>
> Q. What do you mean by "front-line field experience"?
> A. Actually being assigned to a sales office that daily communicates with field salespeople as well as customers.
>
> Q. What was Jim Coburn's last assignment at Rockwell Software?
> A. I don't know.
> Q. Did you know at the time?
> A. At the time of?
> Q. At the time he applied for the position of 1300 [software manager].

A.     No.

Q.     So if Jim Coburn had daily communication with field salespeople both internally and with the customer, you didn't know that, correct?
A.     Correct.

Q.     And you did not inquire, correct?
A.     Correct.

The district court overlooked McDonald's admission that she had no factual basis for her alleged conclusion that Coburn lacked the experience to be software manager.

Moreover, Coburn states that he "had extensive front-line field experience and had worked closely with Ford and numerous other Rockwell customers for years," and he points to supervisor Reckinger's testimony that Coburn had "excellent rapport with his customers" and that he would recommend Coburn for rehiring.

McDonald's admission that she had no knowledge of Coburn's front-line customer experience casts doubt on Rockwell's stated reason for not interviewing Coburn for the software manager position. As the Fifth Circuit reasoned in an age discrimination case:

> Ponville testified that he based his decisions on performance, yet he testified that he was *not* familiar with [plaintiffs] and their job performance. [Plaintiffs] introduced evidence that they had received positive performance appraisals in recent years. * * * [Plaintiffs'] evidence of satisfactory performance, Ponville's failure to keep documentation and his admission that he was not familiar with [plaintiffs] and their job performance, were sufficient to permit an inference that the performance rationale were a pretext for intentional discrimination . . . .

*Tyler*, 304 F.3d at 396-97. Likewise, if a jury credited Coburn's description of his experience and his evidence of positive reviews, it could conclude that Rockwell's "experience rationale" for not hiring him as software manager was a pretext for age discrimination.

The recruiter for that position, McDonald, testified that, in addition to his alleged lack of front-line experience, Coburn had an "integrity issue." McDonald testified as follows:

> Q.    Were there any other reasons you believe Jim Coburn did not meet the criteria for the [software manager] position?
>
> * * *
>
> A.    In my previous working experience with him, he had displayed some integrity issues that caused embarrassment and credibility [sic] from the customer.
>
> Q.    What was the integrity issue?
> A.    He did not give full disclosure to – he did not give full disclosure to product releases that were needed by the customer and he failed to communicate that until we were sitting in front of the customer.
>
> Q.    What do you mean by "full disclosure to product releases"?
> A.    We had committed that we would be able to provide a particular solution to a customer by a specific date and then failed to disclose that the product was not going to be released until we were face to face with the customer.
>
> Q.    At that point he told the customer about the delay in the product release date?
> A.    Correct.

Given that Coburn told the customer face-to-face that the product would not be released by the date promised, it is unclear why McDonald allegedly considered this episode to indicate a lack of "integrity" on Coburn's part. In any event, Rockwell's appellate brief does not claim that this alleged "integrity issue" motivated its decision not to interview or hire Coburn for the Software Manager position. Moreover, the demonstrated falsehood of McDonald's first stated reason for not interviewing Coburn entitles a jury to conclude that she is lying about why she did not interview him and to discount any other reasons that she now claims motivated the decision.

In short, combining this evidence with the age-biased comments Ekberg made during the RIF deliberations, a factfinder could reasonably conclude that the real reason Rockwell did not hire Coburn as Software Manager was age discrimination, not lack of relevant experience or "integrity."

The parties agree that in November 2003, Coburn also applied for the open position of program manager, but he never received a response. Dineen King, who served as Rockwell's recruiter for that position, testified that she was never notified that Coburn had applied. A reasonable jury might believe there was some innocent explanation for Rockwell's failure to give Coburn's Program Manager application to the person responsible for recruiting for that position. But Rockwell offers no evidence that would prevent a jury from finding instead that Rockwell intentionally prevented the recruiter from considering Coburn's application.

Combining the suspicious "accidental" failure to provide the recruiter with Coburn's Program Manager application, with the comments Ekberg made, a factfinder could reasonably conclude that the real reason Rockwell did not hire Coburn as Program Manager was age discrimination. Rockwell is not entitled to summary judgment as to its decision not to hire Coburn as Program Manager.[3]

---

[3]Coburn alleges that Rockwell's past practice had been to recall laid-off employees, before hiring external candidates, when new positions became available. Coburn also alleges that Rockwell's human resources department explicitly told him, at the time of the RIF, that he would receive preferential consideration for new positions over external candidates. Coburn points to Rockwell's failure to follow this alleged policy and practice as additional circumstantial evidence that age discrimination motivated its decision not to hire him into the Software Manager or Program Manager positions. Because Coburn is opposing summary judgment, we must accept as true his allegation that a human resources official told him that he would be accorded preferential consideration for new positions, notwithstanding Rockwell's denial that its HR department made any such promise. Like Rockwell's departure from its alleged policy of trying to RIF temporary employees before non-temporary employees, its departure from the alleged preferential consideration

VI.

For the foregoing reasons, the order granting summary judgment in favor of defendants is

reversed.  This matter is remanded for further proceedings consistent with this opinion.

---

of laid-off employees for rehire could also be taken by a reasonable factfinder as evidence of age-discriminatory motive.